**In re LABELLE INDUSTRIES, INC., Debtor.**

**Bankruptcy No. 840050.**

United States Bankruptcy Court,
D. Rhode Island.

Nov. 16, 1984.

Andrew M. Gilstein, Armstrong, Gibbons, Lodge & Kinder, Providence, R.I., for CLRM Company.

Pasco F. Loffredo, Attorney, Chaika & Loffredo, Cranston, R.I., for Eckart & Finard, Inc.

Albert D. Saunders, Jr., Saunders, Dumas & Fleury, East Greenwich, R.I., for Comet Dye Works, Inc.

Thomas J. Curran, Providence, R.I., for the trustee.

DECISION AND ORDER DENYING MOTION FOR RELIEF FROM STAY

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on the motion of Comet Dye Works, Inc. for relief from the automatic

stay, and for leave to reclaim certain manufacturing equipment from the debtor, Labelle Industries, Inc. Two objecting creditors, Eckart & Finard and CLRM Company, and the trustee argue that four equipment leases between Labelle and Comet are invalid, and that Comet's motion to reclaim should be denied because the equipment in question was not leased, but was in fact a capital contribution from Comet to Labelle.

A summary of Comet's history and business dealings with Labelle is helpful.[1] From 1970 to 1979, Comet was in the textile dye business. In 1978 John Hogan, Comet's president and sole stockholder, began to liquidate the business so that "he could take life a little easier." Hogan's son Michael had been employed as a dyer for Comet, and at about the same time that Comet began to wind down its operation, Michael started his own business and began manufacturing waterbeds as Michael Hogan, d/b/a Labelle Industries. In May 1978, Labelle Industries was incorporated, with an original capitalization of $3,312.66 (100 shares at $33.13 per share). Its owners and officers were Michael Hogan, president and 55% shareholder, his father John, treasurer and 25% shareholder, and mother Dorothy, secretary and 20% shareholder. (Eckart & Finard's Exhibit 1: Labelle Industries, Inc. Minute Book.)[2] For approximately one year after its incorporation, Labelle operated out of the same building as Comet, and at the expiration of Comet's lease, Labelle moved to its present location at Elmwood Avenue.

In 1979, after Comet ceased operating, its textile dyeing equipment was sold for approximately $50,000. John Hogan testified that with prospects for the waterbed business looking good, Comet made several loans to Labelle totalling $32,000, and evidenced by promissory notes bearing interest at 6% per annum.[3] Comet's sole business purpose thereafter became the purchase of waterbed manufacturing machinery and equipment, and the leasing of said equipment and machinery to Labelle Industries. From 1979 to 1983, four separate lease agreements were entered into between Comet and Labelle on which appropriate UCC–1 financing statements were filed with the Secretary of State. (Comet's Exhibits 1, 3, 5, and 7.) The first lease, dated September 1, 1979, covered new equipment as well as some items owned and previously used by Comet. The three subsequent leases, dated February 1, 1980, July 1, 1980 and April 1, 1983 (Comet's Exhibits 2, 4, and 6 respectively) covered only new equipment which was purchased by Comet expressly for lease to Labelle. All four leases called for annual payments over five years, at the end of which time the leased property was to be returned to Comet, or purchased at Labelle's option for its then market value. In the event of any breach by Labelle, the leases entitled Comet to immediate possession of the equipment.

Notwithstanding the reduction to writing of the above ·described arrangement, Labelle made no payments under any of the leases, nor does it appear that Comet ever made demand for payment or took any action to repossess the equipment (with the exception of the instant proceeding in the Bankruptcy Court).

---

1. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rules 7052 and 9014.

2. John and Dorothy Hogan stayed on as shareholders and officers of Labelle until October 1983, when they resigned their positions and transferred their stock to Michael. The stock transfer was made for no consideration and was treated as a gift. In January 1984, three months after Dorothy and John Hogan transferred their stock to Michael, Labelle filed its petition in this Court. Notwithstanding his technical disassociation from the debtor corporation on the eve of its bankruptcy, there is no doubt that John Hogan was a shareholder and officer of Labelle at all times relevant to this proceeding.

3. The validity of the loans from Comet to Labelle has not been raised in the present dispute; however testimony at the April 6, 1984 hearing demonstrated a pattern of less than arm's length dealings between Comet and Labelle, in that there had been no payments made on any of the notes, and no attempts by Comet to enforce payment or collect arrearages.

Additional and virtually conclusive evidence that Comet was never a bona fide equipment lessor, is a report prepared by Lawrence I. Kahn, C.P.A., which discloses that Labelle was always grossly under-capitalized. It is Mr. Kahn's conclusion, based on his review of Labelle's financial statements and federal tax returns, that, but for the "loans" and "equipment leases" made by Comet, Labelle could not have generated sufficient working capital to operate the business. Kahn's Report dated May 7, 1984 (Eckart & Finard's Exhibit 2).

In rebuttal, Comet's witness, William R. McKenzie, also a certified public accountant, testified that Kahn's report "might contain certain oversights", but this comment was unsubstantiated. Based upon all the evidence, we find Kahn's report to be a reliable and credible statement of Labelle's financial condition, and we also accept the opinion stated therein that Labelle was, indeed, always undercapitalized.

The objecting creditors and the trustee correctly point out that the business dealings between Comet and Labelle were not at arm's length, and that a commercially prudent lessor would have commenced either repossession or collection efforts long ago, given Labelle's complete failure to meet its contract obligations. The objectors argue, and we agree, that the "leases" were merely the vehicle selected by John Hogan to make what may only be viewed as capital contributions. Hogan, Comet's sole shareholder, contributed equipment to an insolvent company in which he and his wife owned 45% of the stock (and in which their son owned the balance). The "leases" were utilized in an attempt to provide assets to their son's business, without the risks normally attendant to insider contributions. Based on the record, we agree with the objectors' characterization of the dealings between Comet, the Hogans, their son Michael, and Labelle Industries, Inc.

■ We base the foregoing conclusions on principles traditionally applied, in the bankruptcy context, to insider dealings. Transactions which purport to allow insiders to claim equal or better standing with creditors, in the event of insolvency, are subject to close scrutiny. *See* 11 U.S.C. § 101(25) and 11 U.S.C. § 510(c). *See also* 3 *Collier on Bankruptcy* ¶ 510.05 (15th ed. 1984) at 510–11. An "insider" is one with a "sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor." S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978), U.S. Code Cong. & Admin.News 1978, pp. 5787, 5810. Within the insider concept, *see* 11 U.S.C. § 101(25), are entities which can be classified as "affiliates" of the debtor as defined under Code section 101(2):

"affiliate" means—

. . . .

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor. . . .

Under this statutory definition Comet was an affiliate of Labelle because it was owned and controlled by John Hogan who also owned and controlled more than 20% of Labelle's stock. Clearly, the dealings between Comet and Labelle require close scrutiny.

For insider dealings to be characterized and set aside as capital contributions, it must be established: (1) that the transaction lacked the earmarks of an arm's length bargain, and (2) that it was for the purpose of engaging in some type of inequitable conduct which resulted either in injury to arm's length creditors or unfair advantage to the insider. *See Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.)*, 712 F.2d 206 (5th Cir.1983); *Benjamin v. Diamond (In re Mobil Steel Co.)*, 563 F.2d 692 (5th Cir. 1977); *Arnold v. Phillips*, 117 F.2d 497 (5th Cir.1941); *In re Roco Corp.*, 37 B.R. 770 (Bankr.D.R.I.1984); *Anaconda-Ericsson, Inc. v. Hessen (Matter of Teltronics Services, Inc.)*, 29 B.R. 139 (Bankr.E.D.N.

Y.1983); *In re Featherworks Corp.*, 25 B.R. 634 (Bankr.E.D.N.Y.1982).

■ Whether a "lease" was executed in something less than an arm's length context is a determination that should be based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction, or the fact that the formal documentation is called a lease. *See Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (dominant stockholder's salary claims, allowed to lie dormant for years, were deemed to be capital contributions notwithstanding bookkeeping entries for salary owed). Here, we cannot overlook the plain economic realities of the instant situation, where for more than five years Comet received no payments, yet failed to take any action to obtain payment for or recovery of the "leased" equipment.[4] Clearly, the parties adhered neither to the formal terms of the lease agreements, nor to their substance. Additionally, and despite Labelle's failure to make any rental payments on any of the first three leases, Comet entered into yet a fourth lease agreement in April, 1983.[5] Considering that Comet had only one business account, i.e., Labelle, its conduct was patently unreasonable from a commercial standpoint. The absence of a business advantage to Comet, the working capital requirements of Labelle, and the close family relationship of the shareholders and principals, all lead to the inescapable conclusion that the equipment covered by the so-called leases really constituted a series of capital contributions from Comet to Labelle. *See Tanzi v. Fiberglass Swim-*

*ming Pools, Inc.*, 414 A.2d 484 (1980) (shareholder "loans" to purchase core assets for undercapitalized corporation held to be capital contribution).[6]

Our conclusion is also dependent upon a finding that the transactions "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *In re Mobile Steel Co., supra,* at 700; *see also Comstock v. Group of Institutional Investors*, 335 U.S. 211 at 229, 68 S.Ct. 1454 at 1463, 92 L.Ed. 1911 (1948); *In re Branding Iron Steak House*, 536 F.2d 299, 302 (9th Cir.1976); *Rego Crescent Corp. v. Tymon (In re Rego Crescent)*, 23 B.R. 958, 966 (Bankr.E.D.N. Y.1982); *In re T.E. Mercer Trucking Co.*, 16 B.R. 176, 189 (Bankr.N.D.Tex.1981).

Generally, courts have either set aside or subordinated insider debts arising from transactions with undercapitalized corporations. As compared with non-insider creditors who lack control of or access to information concerning the corporation's financial health, the insider's advantage is obvious and unfair. *See Fett v. Moore (In re Fett Roofing and Sheet Metal Co., Inc.)*, 438 F.Supp. 726 (E.D.Va.1977); *Arnold v. Phillips, supra; Vennerbeck & Clase Co. v. Juergens Jewelry Co.*, 53 R.I. 135, 164 A. 509 (1933). Certainly, in this case, Comet would be hard pressed to deny knowledge of Labelle's financial condition, in light of John Hogan's intimate involvement with both companies.

Courts also readily subordinate insider claims where it is unlikely that non-insiders would have loaned money at the time the insider advance was made. *See Machinery*

---

**4.** In contrast, Labelle's non-insider creditors brought timely lawsuits against the corporation to obtain payment.

**5.** Although Comet has produced well-drafted formal documentation to support its claim, this is all it has produced. There is no evidence to suggest that the parties ever recognized the enforceability of the leases or the underlying obligations, after their execution.

**6.** Among the criteria to be considered in determining the treatment of disputed insider transactions are:

the adequacy of capital contribution, the ratio of shareholder loans to capital. the amount of shareholder control, the availability of similar loans from outside lenders, and certain relevant questions, such as, whether the ultimate financial failure was caused by under-capitalization, whether the note included repayment provisions and a fixed maturity date, whether a note or debt document was executed, whether proceeds were used to acquire capital assets, and how the debt was treated in the corporate records.
*Tanzi v. Fiberglass Swimming Pools, Inc.*, 414 A.2d 484, 490 (1980).

*Rental, Inc. v. Herpel (In re Multiponics, Inc.),* 622 F.2d 709 (5th Cir.1980); *see also In re Trimble Company,* 479 F.2d 103, 116 (3d Cir.1973) (the "test which may be used to decide whether a contribution by a proprietary interest is a loan or an additional injection of capital is whether the advance was made at a time when a bank or other ordinary commercial agency would be willing to lend it funds."), *quoted in In re Rego Crescent Corp., supra.,* at 965.

Based upon the debt to equity ratios[7] derived from Labelle's balance sheets and financial statements, we find that outside lenders would not have been willing to advance funds to Labelle at the times in question. As summarized in Kahn's report, the company's debt to equity ratios were as follows:

| | |
|---|---|
| June 30, 1979 | 21:1 |
| June 30, 1980 | 38:1 |
| June 30, 1981 | 47:1 |
| June 30, 1982 | 56:1 |
| June 30, 1983 | 55:1 · |

Kahn's Report, p. 5.

The report also states that:

> Bankers, in order to lend funds, generally consider a debt to equity ratio of 1:1 or better favorable, 2:1 to 4:1 acceptable for an ongoing situation in its early stages, and 5:1 to 8:1 highly leveraged for borrowing purposes.

Kahn's Report, p. 5.

Labelle was grossly undercapitalized at all times throughout its corporate existence, and without the "loans" and "leased equipment" provided by Comet, Labelle would not have been able to even commence operations, let alone to continue as long as it did. The equipment supplied by Comet allowed the undercapitalized business to appear as a sound venture to suppliers and other potential creditors. Under these circumstances, we find that Comet's labelling contributions as "lease" transactions gave Comet an unfair advantage over Labelle's non-insider creditors:

7. The expert witnesses agree that the debt to equity ratio is a standard test of whether a

 For the reasons stated, we find that it would be inequitable to allow Comet to reclaim virtually all of the debtor's assets pursuant to its alleged rights under the challenged lease agreements. We conclude that the leases in question are void on the ground that the underlying transactions constitute contributions to capital. The motion for relief from stay is denied.

Enter judgment accordingly.

corporation has sufficient working capital to support its operation.