BREYER, Circuit Judge.
 

 In 1977 Pasco DeFusco obtained a Rhode Island state court judgment for $38,500 against Frank and Pauline Giorgio. Pasco DeFusco died in 1981; the Giorgios went bankrupt in 1983. The DeFusco estate then tried to collect the judgment from the Giorgios’ bankruptcy estate. The bankruptcy court refused to allow the DeFusco estate to collect the debt on the ground that it represented the proceeds of loans that Pasco had made to Frank Giorgio at usuriously high interest rates. Indeed, the bankruptcy court concluded that usury was so prevalent that state usury and rackeer-ing laws entitled the Giorgio estate to a $138,000 judgment, against Pasco’s executors (his wife and son), and (in part) against the son as an individual. R.I. Gen. Laws § 6-26-4 (1985) (contract charging interest in excess of maximum rate is void, and borrower entitled to recover amount paid); R.I. Gen. Laws §§ 7-15-1
 
 et seq.
 
 (1985) (Racketeer Influenced and Corrupt Organizations Act).
 

 The DeFuscos appealed to the district court. That court pointed out that the Rhode Island courts, in effect, had found Pasco’s loan contract enforceable. The court held that the bankruptcy court’s $138,000 judgment lacked any basis in law. It added that, in respect to the $41,000 claim (the judgment plus interest), the bankruptcy court should have treated the DeFusco estate like any other judgment creditor, 81 B.R. 766.
 

 The trustee of the Giorgio estate now appeals the district court’s determinations. After reviewing the record, we have concluded that the district court was legally correct; the bankruptcy court was wrong; the DeFusco estate may collect the debt to Pasco.
 

 I
 

 Background
 

 The record in this case suffers from certain weaknesses. The only witnesses able to describe the details of the usurious loan transactions are the Giorgios themselves. The one other knowledgeable person is Pasco DeFusco who died in 1981. Important portions of the Giorgios’ testimony lack specificity, and, in certain key respects (related to payment collection by Pasco’s son, Alan), their bankruptcy court testimony contradicts earlier testimony they gave in state court. Nonetheless, we shall, for the most part, take the basic underlying facts to be those that the bankruptcy court found. In our view, the evidence might be read to show the following:
 

 a. Frank Giorgio is an habitual gambler. He owned and operated the Club 400 where gambling frequently took place. He often fell into debt. He sometimes borrowed money from Pasco DeFusco, who played poker at his club.
 

 b. Between 1969 and 1973 Frank Gior-gio borrowed, perhaps, $20,000 from Pasco DeFusco. He would pay DeFusco back usually at a rate of $200 per week. This repayment was meant to include 10 percent interest per week, or 520 percent per year. By 1973 Giorgio thought he might have paid DeFusco as much as $50,000.
 

 c. In 1973 Pauline Giorgio, Frank’s wife, met with Pasco DeFusco. She insisted that Frank pay Pasco all remaining debts and borrow no more. She and Pasco reached an agreement, the essential parts of which (in her opinion) were (1) Frank
 
 *935
 
 then owed Pasco $19,000, (2) Frank would repay that $19,000 through weekly $200 payments, (3) once the amount of the $200 weekly payments reached $19,000, Frank would no longer owe Pasco anything.
 

 d. Between 1973 and 1975 the Giorgios gave Pasco DeFusco $200 per week until the amount paid reached $19,000.
 

 e. In 1975 Frank decided to borrow another $25,000 from Pasco. Pasco agreed to lend him the money provided he would sign a promissory note. When the time to sign arrived, Frank and Pauline, meeting with Pasco and his lawyer, found that the note said they owed Pasco $44,000, though Pas-co had given them only $25,000. When questioned, apparently Pasco or his lawyer said that the extra $19,000 represented interest that Pasco should have charged them for the $19,000 he loaned them between 1973 and 1975; he said that he had accepted repayments without interest which, in his view, he should not have done. Frank and Pauline signed the note.
 

 f. During 1976 the Giorgios made payments on the note, amounting to about $15,000, but then stopped paying. Pasco sued them in Rhode Island state court. They asserted a “usury” defense. R.I.Gen. Laws § 6-26-4. On November 17, 1977, the day of trial, they entered into a consent judgment, which specified that they still owed Pasco $38,500 (an amount that included interest on late payments, costs and attorney’s fees).
 

 g. The Giorgios did not pay the amounts specified in the consent judgment; Pasco levied on their real estate; the Giorg-ios then collaterally attacked the consent judgment in Rhode Island state court. They claimed that the consent judgment rested upon usurious transactions and that they had agreed to it by mistake and under duress.
 
 See
 
 R.I.Super.R.Civ.P. 60(b) (permits a party to obtain relief from a final judgment for mistake, inadvertence, excusable neglect, fraud, or newly discovered evidence). The Rhode Island Superior Court rejected their claim. The Rhode Island Supreme Court affirmed that rejection. The Supreme Court, noting that “facts” that “might support” the Giorgios’ “claim of usury are hotly disputed,” pointed out that normally Rhode Island law does not permit a borrower to waive a usury defense, but that the facts revealed at trial brought the Giorgio’s case “within ... [the] narrow category of cases in which a debtor’s release of a usury claim is not merely a subterfuge to evade the usury statutes.” Since the facts permitted a finding of no duress and showed that the reason the Giorgios signed the consent judgement was “to avoid ... adverse publicity, ... the Giorgios should be bound by their decision to release any potential defense of usury.”
 
 DeFusco v. Giorgio,
 
 440 A.2d 727, 732 (R.I.1982).
 

 h.In 1981 Pasco DeFusco died. In 1982 the Rhode Island Supreme Court issued the decision we have just described.
 
 DeFusco v. Giorgio, supra.
 
 In April 1983 the Giorgios filed for bankruptcy. And, in July 1983 the DeFusco estate filed the claim at issue here. As we have previously pointed out, the bankruptcy court not only rejected that claim, but also entered judgment on behalf of the bankruptcy trustee, against DeFusco’s wife and son, for $138,-000. The district court reversed the bankruptcy court; and we now consider the Giorgio trustee’s appeal of that reversal.
 

 II
 

 The $138,000 judgment against the DeFuscos
 

 The bankruptcy court’s award against the DeFuscos consisted of two basic parts: a) about $15,000 which the Giorgios paid Pasco DeFusco between 1975 and 1977 under the note that led to the consent judgment; and b) $19,000, which the Giorgios paid Pasco DeFusco between 1973 and 1975, before they signed the note. The bankruptcy court held that DeFusco’s wife and son must pay these amounts in their capacity as executors of the DeFusco estate. The bankruptcy court also held that they, as executors, and the son, in his personal capacity, had to pay damages under the Rhode Island racketeering statute, which permitted the court to treble these two sums (the $15,000 and the $19,000), and then add interest and attorney’s fees.
 

 
 *936
 
 We shall consider the lawfulness of the award based on the $15,000 and that based on the $19,000 separately.
 

 A.
 
 The $15,000
 

 The bankruptcy court concluded that Rhode Island usury law permitted the Giorgios’ trustee to recover the $15,000 that the Giorgios paid under the note that led to the consent judgment in 1977. We agree with the district court, however, that Rhode Island law does not permit this recovery. The short, simple, and conclusive proof that this is a correct statement of Rhode Island law, consists of the state Supreme Court’s judgment that the Giorg-ios had waived any usury defense.
 
 DeFusco v. Giorgio,
 
 440 A.2d at 729. To say that the Giorgios could not assert “usury” as a defense under Rhode Island law, is also to say that they themselves could not bring a suit under that same law to recover the money. The record provides no evidence that makes us think that the Rhode Island courts would now hold otherwise. The state courts reached their decision fully aware that the Giorgios might have a valid usury defense.
 

 Nor have we any reason to believe that Rhode Island, in these circumstances, would grant a trustee a legal right that it denies the bankrupt. The hornbook rule of law is that a bankruptcy trustee obtains rights of action belonging to the bankrupt subject to the same defenses or limitations that a defendant might have asserted against the bankrupt himself. 4 L. King,
 
 Collier on Bankruptcy
 
 11541.10[1] (15th ed. 1988); 1 D. Cowans,
 
 Bankruptcy Law and Practice
 
 § 2.7 (1987). Of course, a bankruptcy trustee sometimes has somewhat broader powers; he need not always stand in the the bankrupt’s shoes; but when he steps outside them, he does so in exercise of his duty to protect creditors, as, for example, when the bankrupt’s preferential transfer of assets unfairly threatens to harm them. 11 U.S.C. § 544, § 547 (1984); 4
 
 Collier, supra,
 
 at 11544.01; B. Weintraub & A. Resnick,
 
 Bankruptcy Law Manual
 
 114.03[4] (1986). Here, the Giorg-ios’ decision to waive a usury defense in 1977 was unrelated to potential bankruptcy proceedings or other creditors. Consequently, the trustee must assert the bankrupt’s rights, not someone else’s.
 

 The appellant has argued at length that the law of res judicata as applied to bankruptcy proceedings supports his effort to bring a state law claim against the DeFus-co estate. We believe, however, that the case law in respect to res judicata reinforces the conclusion we have just reached. The Supreme Court has made clear that ordinary principles of res judicata apply to bankruptcy proceedings.
 
 Heiser v. Woodruff,
 
 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1946). What those principles are, and how they apply, in respect to a state court judgment, is itself a matter of state law, 28 U.S.C. § 1738 (1982);
 
 Kremer v. Chemical Construction Corp.,
 
 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982);
 
 Allen v. McCurry,
 
 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Thus, there can be no life to a state law claim, when a state court in a related prior proceeding (as here) authoritatively says that none exists.
 

 Bankruptcy cases that appellant cites as in effect setting aside state court judgments typically involve facts suggesting that the state courts themselves would have set aside the prior state judgment,
 
 see, e.g., Margolis v. Nazareth Fair Grounds & Farmers Market,
 
 249 F.2d 221 (2d Cir.1957) (setting aside judgment amounting to a fraudulent conveyance);
 
 Kelleran v. Andrijevic,
 
 825 F.2d 692, 694 (2d Cir.1987) (state law precluded contesting issue of liability in the absence of fraud),
 
 cert. denied,
 
 — U.S. -, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988); or, they involve circumstances in respect to which state law did not likely foreclose suit,
 
 see, e.g., Coleman v. Alcock,
 
 272 F.2d 618, 621-22 (5th Cir.1960) (state suit involving one creditor does not necessarily “collaterally estop” trustee representing other creditors). Similarly, a federal court might look beyond the words used by a state court, or even a state court finding, to decide how to characterize that state case for purposes of federal law, to decide, for example, whether the state debt involved “fraud” and was
 
 *937
 
 therefore not dischargeable. 11 U.S.C. § 523 (1987);
 
 Brown v. Felsen,
 
 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) (bankruptcy court may consider evidence extrinsic to the judgment of a prior state suit when determining dischargeability of a debt previously reduced to judgment). None of these matters is in issue here.
 

 The appellants also cite
 
 Pepper v. Litton,
 
 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), as showing that bankruptcy courts need not follow principles of res judicata. But we do not understand that case to suggest that a bankruptcy court can permit a state claim in the face of state authority indicating that no such claim exists, nor does it hold that a bankruptcy court can ignore the state’s own law of res judicata.
 
 Cf. Heiser v. Woodruff,
 
 327 U.S. at 736-37, 66 S.Ct. at 857-58 (discussing
 
 Pepper, supra). Pepper v. Litton
 
 does hold that a trustee, for equitable reasons, may subordinate certain legally valid claims to the claims of other debtors. This matter concerns the DeFuscos’ claim against the Giorgios, however, not the Giorgios’ claims against the DeFuscos; we shall address it later.
 
 See
 
 pp. 938-940,
 
 infra.
 

 If the Giorgios’ trustee cannot collect the $15,000 under state usury law, he cannot collect it under the state’s “anti-racketeering” law. R.I.Gen.Laws §§ 7-15-1
 
 et seq.
 
 That law, in relevant part, makes unlawful the “collection of an unlawful debt,” which it defines as a “debt incurred or contracted in an illegal gambling activity ... or which is unenforceable under state law ... because of the law relating to usury.” R.I. Gen. Laws § 7-15-1. The Rhode Island Supreme Court held that the judgment in question was enforceable despite state usury law; the debt in question (that embodied in the note and the judgment) involves at least $25,000 not “incurred or contracted in an illegal gambling activity” (the Giorgios stated in an affidavit that they borrowed the $25,000 to pay business creditors); and, in any event, like the district court, we do not see how the presentation of a valid state judgment in a bankruptcy proceeding could constitute the “collection” of an unlawful debt, as that term is used in this statute. Appellant cites no authority suggesting the contrary.
 

 For these reasons, we conclude, as did the district court, that Rhode Island law does not give the trustee a valid claim to the $15,000.
 

 B.
 
 The $19,000
 

 We agree with the district court that Rhode Island law gives the Giorgios no right to claim the $19,000 from the DeFus-cos. It is important to understand that there are two separate $19,000 amounts. The first consists of the $19,000 that the Giorgios agreed they owed Pasco DeFusco in 1973. They paid this amount in weekly installments, finishing in 1975. The Giorg-ios themselves specified in the bankruptcy court that this payment cleared their account with DeFusco. Once they paid it, they owed DeFusco no more money. The second, and different, $19,000 amount consists of the $19,000 that the Giorgios promised to pay DeFusco in the promissory note they signed in September 1975. The Giorg-ios said they did not owe Pasco DeFusco this money. They claim he inserted this number in the note as a way of collecting more interest on the $25,000 he gave them. They said Pasco claimed he did so because they had not paid him interest on the first $19,000; but they denied that they owed any such interest.
 

 The reason that the Giorgios have no right to sue for the first $19,000 under Rhode Island usury law is that they had paid that $19,000 debt in full by the end of 1975. The statute of limitations permitted the Giorgios to bring an action no later than six years after the cause of action accrued. R.I.Gen.Laws § 9-1-13 (1969). At the latest, the cause of action for the recovery for these moneys accrued with the last payment in 1975.
 
 See Washington Nat. Bldg. & L. Asso. v. Wendling,
 
 102 Va. 279, 46 S.E. 296 (1904); Annotation, 108 A.L.R. 622 (1937). The Giorgios filed for bankruptcy on April 7, 1983, two years after the limitations period had run.
 

 The bankruptcy court held that the entry of the consent judgment in 1977
 
 *938
 
 tolled the statute in respect to the 1975 $19,000 payment because it constituted an “acknowledgment” of the prior debt.
 
 In re Giorgio,
 
 62 B.R. 853, 861 (Bankr. D.R.I. 1988). But we cannot find in this document any such acknowledgment. For an acknowledgment to toll a statute of limitations, the debtor must acknowledge the debt in such a way that one can infer a promise or willingness to discharge an obligation.
 
 Rodriquez v. Santos,
 
 466 A.2d 306 (R.I.1983);
 
 see also
 
 51 Am.Jur.2d § 325. How could one draw any such inference here where the Giorgios had concededly already discharged the prior debt? Appellant cites no authority suggesting that a creditor’s statement made, say, in 1985, “Jones borrowed money from me in 1960 and paid it back in 1961” tolls a usury statute of limitations. If it did, limitations periods would not mean much in usury cases. Yet, the vague, and sometimes contradictory, state of the record before us provides solid evidence for the wisdom of statutes of limitations.
 

 The state RICO statute of limitations contains no specific period of limitations. We therefore assume that the general six-year limitation for civil action governs. R.I.Gen.Laws § 9-1-13. That six-year period expired by 1981, two years before the Giorgios’ bankruptcy petition. Although Rhode Island amended its statute in 1978 to extend the limitations period to ten years, appellants do not contend that the new limitations period applies to claims that accrued before the amendment.
 

 The second $19,000 — the amount that appears in the promissory note — like all the money mentioned in the note, has the same legal status as the $15,000 discussed in “A” above. That is to say, the 1982 Rhode Island Supreme Court decision,
 
 DeFusco v. Giorgio, supra,
 
 forbids the Giorgios to raise a defense of usury in respect to this money; and, that being so, we do not see how Rhode Island law could permit them to characterize the money referred to in the note as “usurious” for purposes of reviving usury claims related to earlier payments, claims that the statute of limitations would otherwise bar.
 
 Cf. McCarthy v. First National Bank,
 
 223 U.S. 493, 32 S.Ct. 240, 56 L.Ed. 523 (1912); Annotation, 108 A.L.R. 622. For similar reasons, no state RICO action can succeed.
 

 To recapitulate, the content of Rhode Island usury law is a matter for the state courts of Rhode Island to decide. If Rhode Island wishes to permit usurious transactions, if it wishes to forbid all such transactions, if it wishes to permit some and forbid others, if it wishes to allow certain borrowers to waive their legal protections, it may do so; and bankruptcy courts, like other federal courts when applying state law, must follow state court decisions. We cannot conceive that the Rhode Island courts, having explicitly stated that Pasco DeFus-co can collect $38,500 from the Giorgios, would permit the Giorgios’ trustee in a bankruptcy proceeding that began some years later to recover those same amounts back from Pasco DeFusco (or his estate) either under state usury law or state RICO law.
 

 Ill
 

 Equitable Subordination
 

 Although the Giorgios cannot sue the DeFuscos, the question remains whether the DeFuscos can collect the unpaid valid $38,500 Rhode Island judgment. The specific question of law is whether the bankruptcy court, in this case, could “equitably subordinate” that claim to the claims of other creditors. It is clear that, in an appropriate case, the bankruptcy court may examine the equities of a particular claim, and subordinate it to the claims of others.
 
 Pepper v. Litton, supra;
 
 3
 
 Collier, supra,
 
 at ¶ 510.05; Weintraub & Resnick,
 
 supra,
 
 at 115.15. The question is whether, here, the record reveals circumstances that make subordination appropriate.
 

 To subordinate a claim, one must find that the circumstances satisfy the following three conditions:
 

 (1) The claimant must have engaged in some type of inequitable conduct.
 

 (2) The misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant.
 

 
 *939
 
 (3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.
 

 In re Mobile Steel Co.,
 
 563 F.2d 692, 699-700 (5th Cir.1977); 3
 
 Collier, supra,
 
 ¶ 510.05 at 510-9 — 510-10. The third condition is satisfied here, but the others are not.
 

 The case law does not suggest that the doctrine of equitable subordination gives the bankruptcy court a
 
 general
 
 license to weigh the moral quality of each debt or to compare creditors in terms of moral worth; rather it indicates that the bankruptcy court may equitably subordinate those debts, the creation of which was inequitable
 
 vis-a-vis other creditors.
 
 It permits a bankruptcy court to take account of misconduct of one creditor towards another, just as that court often can take account of a creditor’s misconduct towards the
 
 debtor
 
 when considering whether to allow, or to disallow, a claim. 11 U.S.C. § 502; 3
 
 Collier, supra,
 
 at 11510.02.
 

 Thus, most cases involving “equitable subordination” also involve corporate insiders or fiduciaries who have obtained unfair advantages over other creditors through, for example, fraud.
 
 See, e.g., Pepper v. Litton, supra
 
 (insider obtained state court judgment as part of a plan to keep an insolvent corporation’s assets from creditor);
 
 In re Multiponics,
 
 622 F.2d 709, 715-20 (5th Cir.1980) (unfair self-dealings and contribution to undercapitalization by insider). Where a bankruptcy court has subordinated the debt of a creditor who was not an insider, it has done so on the ground that that conduct was egregious and severely unfair in relation to other creditors.
 
 In re Bowman Hardware & Electric Co.,
 
 67 F.2d 792, 795 (7th Cir.1934) (creditor’s request that bankrupt not disclose existing loan between them supported subordinating creditor’s claim to that of another creditor who relied on the bankrupt’s false financial statement);
 
 In re Osborne,
 
 42 B.R. 988, 999 (W.D.Wis.1984) (creditor misrepresented debtor’s financial situation to another creditor so that the other creditor would continue to give the debtor credit);
 
 In re Just for the Fun of It of Tennessee, Inc.,
 
 7 B.R. 166, 180 (Bankr.E.D.Tenn.1980) (contractor filed false notice of completion, on which other creditors relied when granting additional credit to bankrupt).
 
 See also In re Teltronics Services Inc.,
 
 29 B.R. 139, 170 (Bankr.E.D.N.Y.1983) (creditor in control of debtor considered an insider for purposes of equitable subordination);
 
 In re Mercer Trucking Co.,
 
 16 B.R. 176 (Bankr. N.D.Tex.1981) (same);
 
 In re American Lumber Co.,
 
 5 B.R. 470, 478 (D.Minn.1980) (same).
 

 In this case, the record reveals no particular inequity vis-a-vis other creditors. The loans in question took place several years before bankruptcy. They were apparently made without other creditors in mind; indeed, the record does not reveal who the other creditors are, and how, if at all, Pasco’s conduct might have been unfair to them. In fact, it is difficult to find any strong inequity even vis-á-vis the Giorgios. Of course, if one accepts the Giorgios’ testimony, Pasco DeFusco loaned them money at astoundingly high rates of interest; but, Giorgio himself apparently ran an illegal gambling establishment,
 
 see,
 
 R.I.Gen.Laws § 11-19-18 (1981), and engaged in the unlawful gambling activity that led to the loans. The record also reveals that the Giorgios told two quite different stories— one in state court and one in federal court —about Alan DeFusco’s involvement in collecting those debts (stories that the DeFus-cos claim were tailored to permit a personal judgment against Alan DeFusco in the federal case). At the same time, as the district court pointed out, the only knowledgeable person who might contradict the Giorgios died in 1981.
 

 It may be that the bankruptcy court subordinated the DeFusco claim not so much because of inequity vis-a-vis the Giorgios or other creditors, as because of the court’s belief that to permit collection of the claim would violate public policy. We need not consider here, however, the circumstances under which (if ever) a bankruptcy court might disallow a claim for this reason. The Rhode Island Supreme Court, in holding the debt collectible, in effect held that it does not violate Rhode Island public policy. Since the record indicates (through the tes
 
 *940
 
 timony of a former state attorney general) that neither violence nor threats of violence were at issue, we cannot say that collection of the debt violates federal “anti-loansharking” policy.
 
 See
 
 18 U.S.C. §§ 891
 
 et seq.
 
 (1984).
 

 In sum, given the passage of time since the loans took place, the poor quality of the evidence in the record, the lack of any clear showing that the “balance of equities” favored the Giorgios, the lack of showing of special inequity vis-a-vis other creditors, and the failure to show that collection of this judgment violates an important Rhode Island, or federal, public policy, we conclude, as did the district court, that subordination or disallowance of the claim is inappropriate here.
 

 For these reasons, the judgment of the district court is
 

 AFFIRMED.