In re HYPERION ENTERPRISES,
INC., Debtor.

Arnold L. BLASBALG,
Trustee, Plaintiff,

v.

Thomas TARRO, Individually and doing
business as Telesis Financial
Service, Defendant.

Bankruptcy No. 91–12630.
Adv. No. 92–1030.

United States Bankruptcy Court,
D. Rhode Island.

Sept. 11, 1992.

plaint to: (1) recharacterize an alleged debt of the Debtor, Hyperion Enterprises, Inc., to Thomas A. Tarro, as a contribution to capital; (2) equitably subordinate the alleged claim of Tarro; (3) avoid as a preferential transfer the January 9, 1991 note and related security interest, and the payments received by Tarro within one year of the filing; and (4) avoid as a fraudulent conveyance the January 9, 1991 note and related security interest, as well as the payments received by Tarro within one year of the filing. Also before us for determination is Tarro's Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d), seeking permission to take possession of and/or liquidate the collateral securing the disputed January 9, 1991, promissory note.

## I. FINDINGS OF FACT

Although the trial of this case was lengthy and covered a wide range of subject matter, most of the evidence is irrelevant to the legal and factual issues we are called upon to decide.[1] For that reason, our determinations herein are based upon those facts which we consider relevant and necessary to make our findings of fact and conclusions of law.

Amedeo C. Merolla, Asquith, Merolla, Anderson Archetto & Kane, Providence, R.I., for trustee, Arnold Blasbalg.

Robert D. Wieck, MacAdams & Wieck Inc., Providence, R.I., for defendant.

### DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on June 17, 18, 29, 30, July 1, and 2, 1992, on the Chapter 7 Trustee's com-

Central to this dispute is a January 9, 1991 $500,000 promissory note executed by the Debtor and given to Tarro within one year of Hyperion's bankruptcy filing. As collateral for this note, Tarro received a security interest in all of Hyperion's assets, including its machinery, equipment, receivables, general tangibles, intangibles and inventory.

In late August or early September, 1991, due to Hyperion's continuing default under

---

1. Counsel for the Trustee was repeatedly cautioned and admonished as to the extent of (apparently) irrelevant information he was putting into the record. Nevertheless, on the representation that he would eventually "make the connection," Trustee's counsel persisted in spending an inordinate amount of time detailing circumstances which have little to do with the merits, including: (1) the opening and operation of three bank accounts at Shawmut Bank; (2) the relationship between the Debtor and Primary Flow Signal; (3) the transfer of Hyperion stock to Tarro and its return by Tarro to Hyperion; and (4) the eventual takeover of Hyperion by Tarro and the subsequent sale of the business to the Elliot Sales Group, Inc. At no time did the Trustee sufficiently link these matters to Tarro vis-a-vis his secured claim in this bankruptcy case. In any event, when questioned as to these, and many other alleged irregularities, Tarro adequately explained to the Court's satisfaction any implied negative inference.

the Note, Tarro seized Hyperion's assets pursuant to the provisions of the note and security agreement. Within days thereafter, on September 12, 1991, Hyperion was placed into state court receivership and a temporary receiver was appointed. However, less than one month later, on October 11, 1991, Hyperion was petitioned into involuntary bankruptcy under Chapter 7 of the Bankruptcy Code (the "Code").

It is the position of the Trustee that the execution of the January 9, 1991 note and security agreement, and any payments made thereunder are avoidable as preferential transfers and/or fraudulent conveyances pursuant to 11 U.S.C. §§ 544, 547, 548, 550 and 551. Alternatively, the Trustee argues that all of the advances from Tarro or his d/b/a, Telesis Financial Services, to Hyperion were actually contributions to capital, and not loans. Finally, the Trustee argues that even if this Court allows the Tarro/Telesis claim, under § 510 of the Code it should be equitably subordinated to the claims of unsecured creditors because of Tarro's alleged insider status and inequitable conduct. Not surprisingly, Tarro denies all of these allegations and seeks an order allowing his claim against Hyperion in the amount of $461,600, as well as relief from stay.

After a thorough review of the record and the applicable law, and once the rhetoric is overcome, we conclude that the Trustee has failed to prove any of the legal grounds he has alleged and/or insinuated to support his position, and that Tarro has adequately established his claim, as secured, in the amount of $461,600, together with accrued interest, fees and expenses.

An abbreviated discussion of the business and lending relationship of these parties goes as follows: Hyperion, a point of purchase display company, so-called, was incorporated in 1977, and was primarily[2] owned and operated by one individual, Dezsoe G. Halmi ("Halmi"). In 1978, Tarro was first engaged as legal counsel by Hyperion, and thereafter he and Dezsoe Halmi developed a close business and personal relationship, each with considerable respect and admiration for the other. Tarro continued to do legal work for Hyperion for a number of years, and as of December 1986, Hyperion was indebted to Tarro in the sum of $63,500 for legal services. To cure this overdue debt, Tarro and Hyperion entered into a weekly installment payment agreement. Just prior to entering into this agreement, however, in September 1986, Hyperion's longstanding regular lender, Peoples Bank, called its line of credit and terminated its lending relationship with Hyperion, threatening the continued operation of the business. When Hyperion sought, but was unable to secure other traditional sources of financing, it was Tarro who came to the rescue, agreeing to loan $200,000 to Hyperion, some of which was to be used to pay off Peoples.[3] This $200,000 was advanced in two installments, the first on September 12, 1986 in the amount of $155,000, and the second on January 8, 1987 in the amount of $45,000. These advances were originally evidenced by separate promissory notes concomitant with their being made, but were later consolidated into a single note, dated March 23, 1987, in the principal amount of $200,000. The March 23, 1987 note was also secured by all of Hyperion's assets, and Tarro's security interest was duly perfected on March 25, 1987. To secure the payment of legal fees as promised in the December 1986 note, Hyperion granted Tarro a second security

---

**2.** At the time of its incorporation, Hyperion was owned by three people: (1) Dezsoe G. Halmi—200 shares; (2) Robert Harrison—200 shares; and (3) Dezsoe Halmi, Sr. ("Halmi, Sr.")—100 shares. Shortly thereafter however, in August or September 1979, Dezsoe Halmi acquired all of Harrison's stock, making him an 80% stockholder. Almost ten years later, in 1988, Halmi caused an additional 1500 shares to be issued, 500 of which were given to Tarro as a gift, and the remainder of which he issued to himself, resulting in a stock ownership picture as fol-

lows: (1) Halmi—1400 shares or 70%; (2) Tarro—500 shares or 25%; and (3) Halmi, Sr.—100 shares or 5%. In 1990, Tarro returned his shares, for no consideration.

**3.** Hyperion also borrowed $100,000 from Co-op Credit Union during this period, and those funds were used, together with Tarro's, to retire the Peoples debt. Other than this one loan however, Co-op was not involved in any long term financing with Hyperion.

interest in all of the assets of Hyperion, and this lien was also perfected on March 25, 1987.

Following these initial loans, Tarro and Hyperion established an ongoing lender-borrower relationship which would continue for the next five years. From 1986 through May, 1988, every loan from Tarro to Hyperion was evidenced by a promissory note and was secured by all of Hyperion's assets, which security interest was properly filed and duly perfected.[4]

In June, 1988, Tarro established his own factoring entity called "Telesis Financial Services" ("Telesis"), for the specific purpose of making operating funds available to Hyperion on a revolving line of credit, based upon purchase orders. At the time Telesis was created, Hyperion was factoring its accounts receivable through Access Capital, Inc. ("Access Capital"), at prohibitive interest rates. Both Tarro and Halmi testified that the reason Telesis was formed was to relieve, at least in part, the economic drain on Hyperion caused by the exorbitant fees being charged by Access Capital. To fund Telesis, Tarro borrowed $200,000 from Bank of New England, and consistent with past practice between Hyperion and Tarro, Telesis' revolving line of credit with Hyperion was secured by all of Hyperion's assets. Under this factoring arrangement, Telesis received a 4% fee on each advance on purchase orders.[5]

In June, 1988, in appreciation of Tarro's ongoing financial assistance to the Debtor, Halmi "gave" Tarro 500 shares of Hyperion stock, constituting a 20% interest in the corporation. There is no evidence as to the value of the shares transferred to Tarro.

Based on what we know now, the value was probably zero.

According to Hyperion's audited financial statements as of November 30, 1988, the balances on the various loans between Tarro/Telesis and Hyperion were as follows: $200,642 was due under the Telesis factoring arrangement; $24,000 was due under the $39,000 Note of April 29, 1988; and $40,000 remained due under the March 23, 1987 $200,000 Note. In addition, as of January 20, 1989, Hyperion owed Tarro $26,929.23 for legal services.[6]

During its 1989 fiscal year,[7] two more advances were made by Telesis to Hyperion: (1) a March 16, 1989, advance of $30,000; and (2) a March 30, 1989, advance of $170,000. Also, as of November 30, 1989, Hyperion was indebted to Tarro's law firm in the amount of $58,000 for legal services. This indebtedness is covered in a November 30, 1989, promissory note between the parties.

In Hyperion's November 30, 1989 financial statements, the following loan balances appear as due Tarro/Telesis: (1) $391,770 under the Telesis factoring arrangement; and (2) $63,000 under the notes of March 23, 1987, April 29, 1988, and November 30, 1989.

During fiscal year 1990, Telesis continued advancing funds to Hyperion as follows: (1) $69,345.17 on December 5, 1989; (2) $5,102.96 on December 8, 1989; and (3) $25,000 on March 27, 1990.

In the spring of 1990, Access Capital found itself "out of formula" with Hyperion. As a result, the parties agreed[8] that Telesis would make no further advances to Hyperion and that Hyperion would suspend

---

4. Early on in the trial, the Trustee questioned the method of proof being used by Tarro to establish consideration for these advances/loans, and at that time we shared his concern. Now, based on the totality of the evidence, including the testimony of Tarro, Halmi, and Cota and copies of the audited financial statements as well as some, but not all of the actual checks, we are satisfied that there was contemporaneous monetary consideration for the loans. To the extent that this conclusion requires a reversal of our prior evidentiary rulings on this subject, it is so ordered.

5. To reduce the outstanding legal bill owed by Hyperion to Tarro's law firm, Telesis credited its factoring fee to reduce Tarro's legal bill.

6. This debt, at one point $46,397.50, was reduced by $19,468.27 as a result of the credit given for Telesis's factoring fees.

7. Hyperion's fiscal year ended on November 30th of each year.

8. The parties to this agreement were Tarro, Hyperion and Access Capital.

all interest payments to Tarro/Telesis until Access Capital was brought back into formula, and it was anticipated that this would occur by November, 1990. When November, 1990 arrived however, Access Capital announced, without prior notice, that it would no longer factor Hyperion's receivables. As a result, in early 1991 Hyperion was required to, and did, find another factor, Concord Growth.

At around this same time, and in order to consolidate all of its indebtedness to Tarro/Telesis, on January 9, 1991, Hyperion executed a new promissory note in the amount of $500,000, which as those before it, was secured by *all* of Hyperion's assets. Again, a UCC Financing Statement was duly filed with the Rhode Island Secretary of State on February 5, 1991.[9] It is undisputed that no new money was advanced in connection with the January 9, 1991 Note and that it was executed in recognition of an antecedent debt. Tarro testified without contradiction that $500,000 is a compromise figure that was intended to combine all of the outstanding loans, advances, and legal fees, as well as the accrued interest on the principal balances from the Spring of 1990 to November 1990. According to Tarro, the actual amount due exceeded $500,000, but that in the spirit of compromise and to simplify matters, he agreed to this lesser amount. Based upon our review of the exhibits and the testimony of the witnesses, we have no reason to disbelieve Tarro on this issue, and in general find his version of the facts to be credible and acceptable.

Subsequently, on May 14, 1991, Tarro advanced an additional $25,000 to Hyperion, which loan is evidenced by a promissory note of even date.

The November 30, 1990 audited financial statements of Hyperion reflect the $500,000 debt. As of July 31, 1991, the principal balance due under this Note is alleged to be $461,600, and is the amount presently sought by Tarro as his claim in this bankruptcy case, "together with accrued interest, fees and expenses."

Under Concord Growth's 1991 factoring arrangement with Hyperion, and in accordance with the parties' previous agreement regarding the payment of Access Capital's debt, Concord Growth was to make all Hyperion advances directly to Access Capital until that obligation was fully satisfied. Once Access was paid off, Concord was free to direct its advances to Tarro/Telesis.

However, before the accomplishment of these lofty objectives, there was an unexpected event which Hyperion says resulted in its demise.[10] Access Capital, after being paid the full amount it had previously claimed was due from Hyperion, demanded an additional $250,000, and refused to release Concord Growth from making advances to it until the extra money was paid. This action, of course, aggravated Hyperion's cash flow problems, causing it to default in its rent payments and in certain payroll obligations. Faced with this latest dilemma, and having received practically no payments during the entire 1991 calendar year, Tarro panicked, and on August 30, 1991, made demand for immediate posses-

9. We find no merit in the Trustee's argument that this loan was unperfected "because the financing statement was not filed within ten days of the loan." The ten day provision pertains either to the perfection of a purchase money security interest or, as the trustee refers, to the determination of when a transfer is made for the purpose of stating a claim of preference. 11 U.S.C. § 547(e). To say that "the code requires that any security interest be perfected in ten (10) days" misstates the law, including the subsection immediately following the one relied upon by the trustee, § 547(e)(2)(B), which states that "a transfer is made— ... at the time such transfer is perfected, if such transfer is perfected after such 10 days." Clearly, this provision illustrates that perfection is not required within

ten days. The Trustee obviously confuses the legal concept of transfer under the Bankruptcy Code with perfection under the Uniform Commercial Code. Here, since Tarro perfected his interest in the Debtor's collateral prior to the filing, he holds a valid security interest, superior to the rights of the Trustee in Bankruptcy, provided the additional avoidance elements contained in § 547(b) are not present.

10. Although we agree that this situation with Access Capital substantially contributed to the collapse of Hyperion when it did, we are not convinced that, absent the glitch with Access Capital, that Hyperion would not be in bankruptcy in any event.

sion of all of Hyperion's assets, in accordance with his rights under the January 9, 1991 Note. Upon receipt of this demand, Hyperion voluntarily delivered possession of its assets to Tarro. Shortly thereafter, on September 12, 1991, the Debtor was petitioned into receivership by a creditor, Rhode Island Plastics Co., Inc., and with the permission of the Rhode Island Superior Court the assets of Hyperion were sold at public auction for $200,000. Those proceeds are in an escrow account pending this Court's disposition of Tarro's proof of claim.

## II. CONCLUSIONS OF LAW

### A. *Fraudulent Conveyance under 11 U.S.C. § 548*

■ To prevail under this section, the Trustee must show that the January 9, 1991 Note and Security Agreement, were given:

(1) ... with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548.

Based upon our review of the evidence, we conclude without difficulty that the Trustee has failed to make out a § 548 claim. There is no proof that the January 9, 1991 transaction, which restructured and consolidated the various secured obligations between Tarro and Hyperion, was done with the intention of hindering, delay-

ing or defrauding Hyperion's other creditors. In fact, no evidence whatsoever was offered with respect to Hyperion's financial condition at that time, or how creditors were harmed by this consolidation. In addition, although the evidence indicates that Hyperion was probably insolvent in January, 1991, the Trustee has not demonstrated that the January 9, 1991 transaction caused Hyperion to receive less than reasonably equivalent value for its then existing financial obligation to Tarro. To the contrary, we accept the testimony of Tarro that the $500,000 Note amount was actually a compromise figure, adjusted downward from the total amount then due.

### B. *Preferential Transfer under 11 U.S.C. § 547*

■ Likewise, the Trustee has failed to demonstrate that the January 9, 1991 Note and Security Agreement constituted a preferential transfer. The pertinent code provision provides that:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the petition; or

(B) between ninety days and one year before the date of the petition, if such creditor at the time of such transfer was an insider, and

(5) *that enables such creditor to receive more than such creditor would receive if—*

(A) *the case were a case under chapter 7 of this title;*

(B) *the transfer had not been made; and*

(C) *such creditor received payment of such debt to the extent provided by the provisions of this title.*

11 U.S.C. § 547(b) (emphasis added).

The Trustee's argument for a finding of preference fails to address the (emphasized) fifth element, namely how the January 9, 1991 Note and Security Agreement enabled Tarro to receive more than he would have received either under Chapter 7, or had the transfer not taken place.[11]

Based upon the record before us, it appears that Tarro first obtained a security interest in all of Hyperion's assets in 1987, and that he preserved that interest right up through the January 9, 1991 Note and Security Agreement. During this four year period, Tarro advanced funds and provided legal services to Hyperion, which loans and services were simultaneously[12] secured by all of Hyperion's assets, and perfected by filing the appropriate security and financing documents.

Moreover, when the January 9, 1991 Note and Security Agreement were entered into, Tarro was already a secured creditor in all of Hyperion's assets, and had the questioned consolidation loan never taken place, Tarro would still have a valid security interest in all of the Debtor's assets. *Matter of Brown*, 46 B.R. 615, 616 (Bankr. S.D.Ohio 1985) (citing *In re Arnett*, 13 B.R. 267 (Bankr.E.D.Tenn.1981), "Defendant at no time relinquished its security interest in debtor's property. Debtor's interest was merely transferred from one obligation of debtor to a rewrite of that obligation").

The Trustee's additional argument that the January 9, 1991 Note and Security Agreement constitute a novation is so devoid of merit and supporting authority, that it deserves and will receive no further comment.

The relevant inquiry is whether, had the January 9, 1991 transaction never occurred, would Tarro still be a secured creditor in all of Hyperion's assets? Based upon the evidence, we rule that he would be. Accordingly, the Trustee has failed to establish a cognizable claim under § 547(b).

### C. *Recharacterization of Loans as Contributions to Capital*

█ Next, the Trustee argues[13] that Tarro should be deemed an insider, and that since Hyperion was "always undercapitalized," ipso-facto, all of Tarro's advances to the Debtor should be treated as contributions to capital. With no supporting authority, the Trustee maintains that "[i]n this area the courts have held that to re-characterize an alleged loan as a capital contribution, the trustee should show that the alleged loan was in economic reality a contribution to capital." Memorandum of Trustee, July 24, 1992, p. 16. However, except for his personal restatement of the law, the Trustee has failed to demonstrate that the alleged loans were "in economic reality" contributions to capital. Accordingly, we reject the Trustee's contention that Tarro is an insider of Hyperion. Although he devoted considerable time describing the "close relationship" between Tarro and Dezsoe Halmi/Hyperion, the Trustee has not shown that their social and/or business relationship satisfies any of the definitions of an insider contained in § 101(31). Neither are we persuaded that Tarro's minority 25% stock ownership in Hyperion for a two year period classifies him as an insider. The Code simply does

---

**11.** The Trustee's constant harping about the fact that the January 9, 1991 Note and Security Agreement were on account of an antecedent debt does nothing to advance his cause, but rather points up the weakness in his position. The Trustee forgets and/or ignores the fact that unless he establishes *each and every* element of § 547(b), he may not avoid the transfer.

**12.** While in some instances the security documents were not immediately executed or recorded, all such interests were perfected prior to Hyperion's bankruptcy filing, which is the operative date for determining whether such claims could be avoided by a hypothetical lien creditor. *See* 11 U.S.C. § 545(2).

**13.** We agree with Tarro that the Trustee's argument concerning recharacterization of the debt and equitable subordination are intermingled and not separately addressed, as they must be in order to decide whether equitable subordination is appropriate. For this reason, we will consider the recharacterization issue in the first instance, and if rejected, move on to equitable subordination considerations.

not extend insider status to these circumstances, and we are neither inclined nor at liberty to create such a category.

In *In re International Club Enterprises, Inc.,* 109 B.R. 562 (Bankr.D.R.I.1990), we found that a 50% stockholder of a closely held corporation was an insider. That ruling, however, was based on very strong evidence that the 50% stockholder dominated the debtor "virtually from the moment it opened for business." *Id.* at 565. Such "control" is a classic ground for defining one an insider. Here, the record is devoid of any evidence that Tarro either had or exercised any control whatsoever over Hyperion during the entire five year history of his relationship with Hyperion. Ironically, in fact, the evidence is that Tarro was so lacking in control that, unlike Hyperion's other lender, Access Capital, Tarro was consistently unsuccessful in his efforts to realize on his overdue claim. All it did was grow larger, and this is not consistent with the "domination" or "control" argument. However, notwithstanding our finding that Tarro was not an insider, but in order to provide a complete record for possible appellate purposes, we discuss below the factors considered previously by this Court in determining whether Tarro's debt should be deemed "contribution to capital" *had* he been found to be an insider.

In *In re Labelle Industries, Inc.,* 44 B.R. 760 (Bankr.D.R.I.1984), we endorsed the criteria set by the Rhode Island Supreme Court in *Tanzi v. Fiberglass Swimming Pools, Inc.,* 414 A.2d 484 (R.I.1980), for considering the treatment of disputed insider transactions. These factors include: (1) the adequacy of capital contributions; (2) the ratio of shareholder loans to capital; (3) the amount or degree of shareholder control; (4) the availability of similar loans from outside lenders; and (5) certain relevant questions, such as (a) whether the ultimate financial failure was caused by under-capitalization; (b) whether the note included payment provisions and a fixed maturity date; (c) whether a note or other debt document was executed; (d) whether advances were used to acquire capital assets; and (e) how the debt was

treated in the business records. *In re Labelle,* 44 B.R. at 763, n. 6.

Applying these same criteria here, we conclude that the numerous financial transactions between Tarro/Telesis and Hyperion were genuine loans, and not disguised capital contributions. Our decision is based on several material facts, including: (1) the careful loan document process followed throughout the five year lending relationship; (2) the fact that Tarro acquired the stock of Hyperion as a nominal gift, which he later returned for no consideration; and (3) the total lack of control by Tarro over the operation of Hyperion, or as to the payment of these obligations. In addition, we find it significant that at all times Hyperion did have (albeit very expensive) other borrowing sources, i.e., Access Capital, and later Concord Growth, which were the main sources of financing for the corporation; that the Tarro loan proceeds were not used by Hyperion to acquire capital assets, but were used for normal operations; and that the debt to Tarro was consistently and long before bankruptcy was contemplated, treated by Hyperion in its business records as loans and advances, and *never* as capital.

We specifically reject the Trustee's contention that Tarro's intention was to risk his capital upon the success of the venture. There is no evidence that Tarro expected that the payment of these obligations was contingent upon Hyperion's ultimate success as a point of purchase business, and we would be entirely out of line to make such a finding, by inference or otherwise. We also reject as completely baseless the argument that Tarro "permitted huge loans to be made by Hyperion to Primary Flow Signal." This subject is among those having no connection to Tarro, but which the Trustee insisted upon dwelling at great length. We find no evidence in the record to place the responsibility for any such questionable conduct and/or action on Tarro.

Accordingly, for all of these reasons, even were Tarro considered *hypothetically* to be an insider, we would rule that the advances in question were loans, and not

contributions to capital. Obviously, our ruling that these loans are genuine, and not contributions to capital, applies even more strongly in the context of Tarro not being deemed an insider.

### D. Equitable Subordination

■ Next, we consider the Trustee's request that we equitably subordinate Tarro's claim to the claims of unsecured creditors, because of his alleged inequitable conduct.

Curiously, neither side has referenced the controlling authority in this Circuit regarding equitable subordination, *Boyajian v. DeFusco (In re Giorgio)*, 862 F.2d 933 (1st Cir.1988). In that case, the First Circuit articulated the elements necessary for the Court to subordinate a claim under § 510(c),[14] adopting those pronounced by the Fifth Circuit in the seminal case of *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977):

(1) The claimant must have engaged in some type of inequitable conduct.

(2) The misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant.

(3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*In re Giorgio*, 862 F.2d at 939–939.

The *Giorgio* case is particularly notable to this Court, as we were pointedly counseled by the Appeals Court that:

The case law does not suggest that the doctrine of equitable subordination gives the bankruptcy court a *general* license to weigh the moral quality of each debt or to compare creditors in terms of moral worth; rather it indicates that the bankruptcy court may equitably subordinate those debts, the creation of which was inequitable *vis-a-vis other creditors*. It permits a bankruptcy court to take account of misconduct of one creditor to-

wards another, just as that court often can take account of a creditor's misconduct towards the *debtor* when considering whether to allow, or to disallow, a claim.

*In re Giorgio*, 862 F.2d at 939 (emphasis in original) (citing 11 U.S.C. § 502; 3 L. King, *Collier on Bankruptcy* ¶ 510.02 (15th ed. 1988)).

■ Where the creditor is not an insider, the court must find that the "conduct was egregious and severely unfair in relation to other creditors." *In re Giorgio*, 862 F.2d at 939. Here, and as the Court of Appeals found in *In re Giorgio*, there is no evidence that the loans in question were made "with other creditors in mind" or "how, if at all, [Tarro's] conduct might have been unfair to them."

Accordingly, with no evidence before us to even suggest that the loans by Tarro/Telesis were unfair to other creditors, or that any special inequity resulted from such loans vis-a-vis other creditors, the Trustee's request for equitable subordination must be denied. Having already been there in *Giorgio*, where we felt that misconduct was rampant and warranted subordination, this Court is clearly not at liberty to embark on a similar mission here, where the creditor is guilty of no misconduct.

### E. Relief from the Automatic Stay

■ Finally, we address Tarro's motion for relief from the automatic stay, and for permission to take possession of and/or liquidate the collateral securing his claim.

As discussed *ante*, and in light of our rejection of all of the prayers in the Trustee's complaint, we conclude that Tarro holds a claim in this bankruptcy case of $461,600, together with accrued interest, fees and expenses. It is our understanding that the collateral securing Tarro's claim has already been liquidated, with the permission of the state court, and that the

---

**14.** 11 U.S.C. § 510(c) provides that:
Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
  (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
  (2) order that a lien securing such a subordinated claim be transferred to the estate.

proceeds, $200,000, are being held in escrow.

Accordingly, in the context of this Chapter 7 case and where the Debtor clearly has no equity in the proceeds, we hereby GRANT Tarro's motion for relief from stay.

Enter Judgment consistent with this opinion.