In re **INTERNATIONAL CLUB ENTERPRISES, INC.** Montie Ciarlo, Debtors.

Louis A. **GEREMIA**, Trustee, Plaintiff,

v.

**FORDSON ASSOCIATES**, Peter J. Rotelli, Richard R. Tasca, and James A. Procaccianti, Defendants.

Bankruptcy Nos. 8800828, 8800866. Adv. No. 891017.

United States Bankruptcy Court, D. Rhode Island.

Jan. 17, 1990.

Andrew S. Richardson, Boyajian, Harrington & Richardson, Providence, R.I., for trustee.

Gregory W. Hamilton, Winograd, Shine & Zacks, P.C., Providence, R.I., for defendants.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard on October 4 and 5, 1989 on the Trustee's, Complaint, brought pursuant to 11 U.S.C. § 547, to recover allegedly preferential payments made by the debtors to Fordson Associates ("Fordson"). Based upon the stipulated facts in the Joint Pretrial Order, the testimony of the witnesses, and the documentary evidence, we make the following findings of fact:

The debtor, International Club Enterprises, Inc. ("ICE") is a Rhode Island corporation formerly engaged in the restaurant/nightclub business at 500 Oaklawn Avenue, Cranston, Rhode Island. ICE filed for relief under Chapter 11 on November 30, 1988, and the case was subsequently converted, on January 24, 1989, to Chapter 7. The defendant Fordson is a Rhode Island general partnership, with Peter J. Rotelli, Esquire, Richard R. Tasca, Esquire and James A. Procaccianti as its general partners.

The relationship between ICE and Fordson began on February 24, 1988 when ICE, through its principals and sole shareholders, Montie Ciarlo and Walter Barletta, entered into a letter agreement with Fordson (Plaintiff's Exhibit A), whereby Fordson agreed to lend the principals of ICE $60,-000 to complete construction of the ICE restaurant, and to purchase inventory.[1] Also pursuant to the letter agreement, Proc Associates, a management corporation run by James Procaccianti, was to assume certain administrative functions of operating ICE, including control over the checkbook. Shortly after the execution of the letter agreement, Fordson advanced $60,000 to Ciarlo and Barletta, who deposited the cash into the ICE account. Fordson loaned ICE an additional $30,000 on March 14 and 15, 1988.

Not long after the March 8, 1988 opening of the nightclub, a dispute arose between Fordson and Ciarlo and Barletta regarding the operation of the club. The evidence clearly establishes that James Procaccianti took control of the nightclub and immediately demanded Barletta's dismissal; he hired his sister, Betty Procaccianti to assume management and supervisory roles; he brought in Ralph Torrado as manager for a brief period; he hired Yens Thompson as a consultant and Michael Cox as the bookkeeper. Not surprisingly, the business relationship quickly deteriorated, and on March 11, 1988, Fordson demanded payment of the $60,000. On March 14, 1988 when ICE was unable to honor the demand, Fordson exercised its option to buy 50% of ICE's stock (Plaintiff's Exhibit F), whereupon negotiations commenced between the parties concerning a possible buyout. On this issue, we accept Ciarlo's testimony that the reason he rejected Fordson's offer of $75,000 was that Fordson would not agree to assume Ciarlo's personal obligation to the Rhode Island Business Development Corporation in the amount of $150,-000, which was secured by a mortgage on his home. Ultimately, the parties were unable to reach any settlement on the proposed buyout.

On March 18, 1988, Procaccianti ordered Ciarlo off the ICE premises. Thereafter,

---

1. In accordance with the letter agreement, the following documents were executed by the parties: (1) a promissory note in the amount of $60,000 executed by Ciarlo and Barletta to Fordson; (2) a promissory note in the amount of $60,000 executed by ICE to Ciarlo and Barletta (Exhibit C); (3) an assignment of the ICE note to Fordson by Ciarlo and Barletta (Exhibit D); and (4) an "Irrevocable Stock Powers" document executed by Ciarlo and Barletta transferring 50% of their individual shares of stock in ICE to an escrow agent for purchase by Fordson at its option (Exhibit E).

on March 23, 1988, Ciarlo was contacted by the Cranston Police, who (mysteriously) placed Ciarlo back in control of ICE, and removed Fordson representatives from the premises.

The very next day, March 24, 1988, Fordson filed an involuntary Receivership Petition against ICE in the Rhode Island Superior Court, asserting its ownership of 50% of the stock of ICE and requesting, inter alia, the appointment of a receiver "for the purpose of dissolution of ICE" (Plaintiff's Exhibit G). In the affidavit appended to the Complaint, Peter Rotelli asserted Fordson's ownership of 50% of ICE's stock alleging that Procaccianti was "attempting to oversee the management of the nightclub ICE" (Plaintiff's Exhibit G).

On March 25, 1988, the parties reached an agreement in the receivership proceeding, which was memorialized in a Stipulation dated March 28, 1988 (Plaintiff's Exhibit K) providing, inter alia, that (1) defendants Montie Ciarlo and Walter Barletta would pay Fordson Associates $37,463.69 within thirty days of the entry of the order; (2) the parties would attempt to negotiate, in good faith, the remaining $37,400 in dispute, and to achieve a resolution within thirty days of the order; (3) Fordson acknowledged the receipt of $70,000 in certified funds from ICE, with an additional $20,000 to be paid to Fordson by March 28, 1988; and finally, (4) Fordson was to execute an agreement to convey back to Barletta and Ciarlo its 50% ownership of ICE stock. The agreement was to be held in escrow pending payment by Ciarlo of the $37,463.69 to Fordson.

On April 28, 1988, in compliance with the Stipulation, Barletta and Ciarlo paid the $37,463.69 to Fordson. However, Fordson, apparently without cause, refused to turnover the escrowed agreement relating to the ICE stock, requiring Ciarlo to seek and obtain an order from Judge Almeida directing the defendants to transfer the stock back to Ciarlo and Barletta.

Of the money paid to Fordson by Ciarlo and Barletta, $50,000 was provided by Mary Barletta, Walter Barletta's grandmother, $20,000 was advanced by Jerome Geller, the lessor of ICE's premises, and $20,000 was provided by Barbara and John Kenny, Barletta's sister and brother-in-law. These sums were in payment of the original $90,000 loaned by Fordson to ICE. In addition, the April 28, 1988 payment of $37,463.69 consisted of a $35,500 check provided by Neil Saunders and $1,963.69 in cash.

## PREFERENTIAL TRANSFER

Under § 547(b), the Trustee has the burden of proving that the transfer was of an interest of the debtor in property, and

(1) to or for the benefit of a creditor

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made

(3) made while the debtor was insolvent

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider.

11 U.S.C. § 547(b).

In relation to § 547(b), the parties raise four issues for our determination:

(1) whether Fordson was an insider at the time the transfers were made;

(2) whether the payments to Fordson constituted a transfer of an interest of the debtor in property;

(3) whether ICE was insolvent at the time the payments were made to Fordson; and

(4) whether the payment of $37,463.69 was to or for the benefit of Fordson.

We answer each of these in the affirmative.

## INSIDER STATUS

■ The trustee may avoid a transfer of an interest of the debtor in property within one year of the filing of the petition if the transfer was to an insider. Where the debtor is a corporation, an insider is defined as either a director or officer of the debtor, a person in control of the debtor, or

a relative thereof. 11 U.S.C. § 101(30). The legislative history to this section describes an insider as "one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." H.R.Rep. No. 595, 95th Cong., 1st Sess. 311–314 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6268–6271; *see also Monzack v. ADB Investors, Bristol Assoc. Inc. and Dade Service Co. (In re EMB Associates, Inc., Max Sugarman Funeral Home, Inc.)*, 92 B.R. 9, 15 (Bankr.D.R.I.1988); *Castellani v. Kohne (In re Kucharek)*, 79 B.R. 393, 395 (Bankr. E.D.Wis.1987); *Lingley v. Stuart Shaines, Inc. (In re Acme–Dunham, Inc.)*, 50 B.R. 734 (D.Me.1985). Sufficient control to be deemed an insider has been found where a creditor does not deal at arms length with the debtor, but rather, has a special relationship with the debtor through which it can compel payment of its debt. *DeRosa v. Buildex, Inc. (In re F & S Central Mfg.)*, 53 B.R. 842, 848 (Bankr.E.D.N.Y.1985). Moreover, as the trustee correctly pointed out in his post-trial memorandum, "a shareholder has enough control over a company to be considered an insider when that person can determine corporate policy, whether by personally assuming management responsibility or by selecting management personnel." *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726 (11th Cir.1986); *see also Vadnais Lumber Supply, Inc. v. James P. Byrne (In re Vadnais Lumber Supply Inc.)*, 100 B.R. 127, 131, 21 C.B.C.2d 19, 23 (Bankr.D. Mass.1989) ("[T]he defendants were in control at the closing by reason of their eighty percent stock interest and the offices which they held" *Id.* 131, 21 C.B.C.2d at 23).

Based on the record before us, most notably Fordson's admission in the state court receivership petition that it owned 50% of the ICE stock, as well as the evidence of Fordson's domination of the debtor virtually from the moment it opened for business, we find as a fact and conclude as a matter of law that Fordson was an insider of the debtor prior to and on the day of the transfers in question. Moreover, in light of the relationship between Fordson and Proc Associates created by the management agreement, we conclude that all action taken by Proc Associates with respect to ICE was impliedly, if not expressly, authorized by Fordson, a partnership in which James Procaccianti is a general partner.

Fordson's control over the debtor was demonstrated by its firing of former club employees and/or principals, the bringing in of new management as well as a "consultant," and total control of the corporate checkbook, to the exclusion of Ciarlo or Barletta. These actions clearly render Fordson's relationship with the debtor to be that of an insider. Furthermore, we find that Fordson exercised its greatest control through its ability to procure the settlement agreement in the receivership action which led to the transfers in question. Were it not for Fordson's claim of 50% ownership in the debtor corporation, the agreement requiring ICE to pay Fordson an immediate $90,000, and the remaining $37,463.69 within thirty days, would not have been obtained. Moreover, we reject Fordson's argument that by holding the ICE stock in escrow pending full payment by Ciarlo and Barletta, that somehow Fordson's ownership rights were extinguished. In fact, the very purpose of the escrow agreement was to insure that the principals of ICE paid the money due Fordson. It is ludicrous to suggest that if Ciarlo and Barletta did not comply with the monetary obligation imposed under the stipulation, that Fordson would have nevertheless surrendered the stock to Ciarlo and Barletta. In such an event, Fordson clearly would have claimed the stock as its own.

### INTEREST OF DEBTOR IN PROPERTY

In order to prevail in a preference action, the Trustee must also show that the property transferred was property in which the debtor held an interest. 11 U.S.C. § 547(b). In its post-trial memorandum, Fordson argues that "[t]he evidence presented at trial in this present case establishes that the payments made to Fordson did not come from the Debtor, but were

provided by third parties." (Defendant's post-trial memorandum, October 13, 1989, p. 5–6). This contention is commonly known as the "earmarking doctrine."

According to this doctrine, "under certain circumstances, a transfer from a third party to a creditor of the debtor is not avoidable as a preference." *Titan Energy Corporation v. Central Oilfield Supply Co. of Logan, Ohio (In re Titan Energy Corp.)*, 82 B.R. 907, 909 (Bankr.S.D.Ohio 1988). "[W]here the only change is in the identity of the creditor, without a corresponding depletion of the bankruptcy estate, one policy underlying the power to avoid a preference has not been offended by the transfer" *Id.* For instance, "[i]f funds from a third party are specifically designated for transfer to a particular creditor and the debtor is either a mere conduit or uninvolved in the transfer, the funds are specifically said to be 'earmarked'" *Id.* at 909.

The earmarking doctrine, a creature of judicial invention, initially arose in situations where "the new creditor was a guarantor of the debtor's obligation, such as a surety, a subsequent endorser or a straight contractual guarantor." *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enterprises, Ltd)*, 859 F.2d 561, 565 (8th Cir.1988). Over time, the doctrine has been extended by a number of courts "to situations where the new creditor is not a guarantor but merely loans funds to the debtor for the purpose of enabling the debtor to pay the old creditor." *Id.* at 566 (citing *Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2d Cir.1938) and *In re Sun Railings Inc.*, 5 B.R. 538 (Bankr.S.D. Fla.1980)). Recently, however, this extension of the doctrine has come under sharp criticism. *See, e.g., In re Bohlen Enterprises, Ltd., supra,* at 566; *McGoldrick v. Juice Farms, Inc. (In re Ludford Fruit Products, Inc.)*, 99 B.R. 18, 21 (Bankr.C.D. Cal.1989). "Where there is no guarantor, the earmarking doctrine does not help either the new creditor or the debtor. In fact, the new creditor is harmed. He is a general creditor whose recovery must come from a debtor's estate which is diminished to the extent that the payment made to the old creditor cannot be recovered as a preference. The only person aided by the doctrine is the old creditor, who had nothing to do with earmarking the funds, and who, in equity, deserves no such benefit." *In re Bohlen Enterprises, supra,* at 566.

A second line of cases addressing the earmarking doctrine focuses not on the relationship of the creditor advancing the funds, but rather on the degree of control the debtor possesses over the disputed funds. *See, e.g., Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1359 (5th Cir.1986); *Van Huffel Tube Corp. v. A. & G Industries (In re Van Huffel Tube Corp.)*, 74 B.R. 579 (Bankr.N. D.Ohio 1987); *New York City Shoes v. Best Shoe Corp. (In re New York City Shoes)*, 98 B.R. 725, 729 (Bankr.E.D.Pa. 1989). "[S]uch 'earmarking' must be accompanied by the element of strict control by the third party over the distribution of the funds which it advances to the debtor. If such control is lacking, the debtor is and would be completely within its rights in retaining the funds received, or using them in whatever other way the debtor wishes." *Id.* at 729.

In considering this doctrine, the Fifth Circuit Court of Appeals observed that "[t]he earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate." *Coral Petroleum, Inc., supra,* at 1356. Under this analysis, "the creditor seeking to invoke the 'earmarking' doctrine must ... establish that the third party, as opposed to the Debtor, controlled the distribution of the funds. Failing this, we believe that the creditor has a most difficult burden in establishing the absence of diminution of the Debtor's estate as a consequence of the transfer." *In re New York City Shoes, supra,* at 729. Furthermore, "[i]f the debtor, rather than the third party, has the power to determine how the funds can be used, then the debtor's exercising its discretion to disperse the funds, as op-

posed to retaining them, is an act which diminishes the assets of the debtor's estate." *In re New York City Shoes, supra; Matter of Van Huffel Tube Corp., supra* ("In order for the earmarking doctrine to apply ... it must be shown that the Debtor had a lack of dispositive control over the funds in question." *Id.* at 585).

In determining whether a debtor has control over funds in dispute, courts generally consider: (1) whether the creditor placed any restriction on the debtor's use of the funds; (2) whether the debtor had physical control of the funds and (3) whether the debtor had the ability to direct to whom the funds should be paid. *See Matter of Van Huffel Tube Corp., supra,* at 585–586.

In consideration of the foregoing decisional authority, and based upon the facts present in the instant dispute, we agree with the Eighth Circuit that extension of the earmarking doctrine beyond the guarantor situation is both unwise and unwarranted, and would inevitably result in an inequitable treatment of creditors. Given this conclusion, we rule that the earmarking doctrine does not apply in this instance, where none of the money transferred to Fordson was based on a guarantee or similar obligation.

However, in the event that a reviewing court in this circuit holds that the earmarking doctrine should be extended beyond the guarantor situation, we will consider below whether the debtor had "control" over the funds in question.

The uncontroverted testimony of Ciarlo, which we accept, disclosed that: (1) the initial $50,000 check provided by Barletta's grandmother was payable directly to ICE, with "no strings attached," and without knowledge of the Fordson obligation; (2) the $20,000 check furnished by Geller, ICE's landlord, initially made out to ICE, was subsequently replaced with a certified

check payable to Ciarlo, and was also a loan to ICE with "no strings"; (3) a second $20,000 check was given by Barletta's sister and brother-in-law, the Kenny's, and like the others, was initially made out directly to ICE, but because of Fordson's request for certified funds, was later replaced with a cashier's check, payable to Fordson; (4) the $35,500 loaned to ICE by Neil Saunders, acknowledged by a promissory note given by ICE, was payable to Ciarlo and then endorsed to Fordson, together with $1,963.69 in cash, in satisfaction of the final $37,463.69 obligation due Fordson under the stipulation. We conclude, based on the evidence, that all of the above funds were loaned to ICE without any restriction as to their use, were either given directly to ICE or its principals, or were so intended,[2] and that the debtors had full authority to direct to whom the funds should be paid. Fordson has failed to provide any evidence that the third parties involved, as opposed to the debtors, controlled the distribution of these funds, and we find no support in the record for such a ruling.[3]

### INSOLVENCY

■ Fordson contends that the debtor was solvent at the time the transfers were made and therefore, pursuant to § 547(b)(3), it received no preference. There is no factual merit in this argument, and we dispose of it without difficulty.

Under the Code, insolvency is defined as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(31). While it is true that in appropriate circumstances the test employed for valuing the debtor's assets is the value of the business as a going concern, *Vadnais Lumber Supply Inc. v. Byrne (In*

---

**2.** There is evidence that some checks initially written directly to ICE had to be replaced by either certified funds or a cashier's check, which were payable to Ciarlo or to Fordson.

**3.** On this critical issue, we admonish Fordson for representing in its post-trial memorandum that most, if not all, of the third-party checks were made out directly to Fordson when, after a

diligent review of the testimony and documents, the evidence is clearly to the contrary. These unfounded statements caused considerable unnecessary time and effort to be spent exploring Fordson's argument on this point and, overall, has complicated and delayed our determination of this matter.

*re Vadnais Lumber Supply Inc.)*, 100 B.R. 127, 131, 21 C.B.C.2d 19, 24 (Bankr.D.Mass. 1989), it is also true that, in other situations, "the liquidation value is appropriate ... if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic." *In re Vadnais Lumber Supply, Inc., supra,* at 131, 21 C.B.C.2d at 24. Here, it is undisputed that the debtor's business operations lasted at most for only six weeks, that a going concern value had not been established, and that at the time the transfers were made the corporation was already in receivership. Accordingly, we hold that the value of the business as a going concern is an inappropriate test to be applied in this instance.

Turning then to the evidence introduced as to the value of ICE's assets and liabilities, Fordson's figures relating to the assets of the debtor are readily discounted, and once reduced, result in liabilities exceeding assets by more than $100,000 on the balance sheet. According to Fordson's accountant, Kathleen Casale, as of March 25, 1988, ICE had liabilities of $404,464 and assets of $421,598, or a positive position of $17,134 (Defendant's Exhibit 1). We agree with the analysis of the Trustee's accountant, Gerald Renza, that: (1) pre-opening expenses of $46,294 should not have been included as an asset; (2) the $8,600 Geoffrey Osborne nonrefundable deposit should not have been included as an asset; and (3) leasehold improvements of $78,363 were improperly included as assets. The reduction of these figures alone, which total $133,257, without considering the excessive values attributed by Casale to the remaining assets, renders ICE's liabilities far in excess of its assets. Based on the foregoing adjustments, we conclude that ICE was indeed insolvent at the time the transfers in question were made.

### PAYMENT OF $37,463.69

 Lastly, we are required to determine whether ICE's payment of $37,463.69 under the stipulation agreement was to or for the benefit of Fordson under § 547(b)(1). Fordson argues that "the $37,-463.69 represented debts owed to various other creditors for goods and services provided to ICE" (Defendant's post-trial memorandum, p. 9–10). This contention is rejected on two grounds.

First, we find significant the testimony of Ms. Casale and Mr. Procaccianti regarding the purchase of certain items for which the $37,463.69 is attributable. Specifically, Casale testified that Proc Associates was able to order and obtain delivery of these items more readily due to its extensive business dealings in the community, and because Procaccianti owned Speedy Rentals, from whom the television equipment was obtained. Based on ICE's poor financial condition and its lack of a credit worthy reputation in the community, we conclude that the goods and services in question would not have been furnished if not for Fordson's intervention and guarantee. Accordingly, we hold that said debt was an obligation of Fordson, as well as a debt owed by ICE.

Secondly, we are unable to overlook Fordson's inconsistent position with regard to these expenses in the stipulation agreement entered into in the receivership action. There, Fordson asserted that these very expenses, totaling $37,463.69, were debts ICE owed to Fordson, and *not* to some other entity. Now after receiving the money, Fordson asks this court to allow it to forget its earlier claim to these funds, and to rule that "Fordson had no 'right' to payment" (Defendant's post-trial memorandum, p. 10). This argument comes a little too late for such a ruling. Had Fordson taken this position in the state court proceeding, its present position would be much more persuasive. Its assertion that it had no interest in these funds, after having required ICE to make this payment or forfeit its shares of stock, is a change of position which strains credulity. We agree with the Trustee that "[w]here Fordson on an earlier occasion represented under oath that it was owed these monies by ICE it should be estopped from now claiming the contrary." (Trustee's post-trial memorandum, p. 20.) Accordingly, we hold that the $37,463.69 was paid to or for the benefit of Fordson.

In accordance with the above rulings, we conclude that the Trustee has established all of the required elements under § 547 to constitute preferential transfers, and that Fordson is ORDERED to return to the Trustee the $127,463.69 in question.

Enter Judgment accordingly.