**In re FREESTATE MANAGEMENT SERVICES, INC.**

**Richard L. WASSERMAN, Chapter 11 Trustee, Plaintiff**

**v.**

**VILLAGE ASSOCIATES, Defendant.**

Bankruptcy No. 88–5–1912–JS.
Adv. No. A90–0453–JS.

United States Bankruptcy Court, D. Maryland.

April 8, 1993.

Richard L. Wasserman, Rochelle B. Fowler, Venable, Baetjer and Howard, Baltimore, MD.

F. Thomas Rafferty, Lawrence J. Yumkas, Blum, Yumkas, Mailman, Gutman and Denick, P.A., Baltimore, MD.

## MEMORANDUM OPINION GRANTING TRUSTEE'S COMPLAINT TO RECOVER A PREFERENTIAL TRANSFER

JAMES F. SCHNEIDER, Bankruptcy Judge.

### SYNOPSIS AND ISSUES.

A bank made secured loans totalling $675,000 to directors of an insolvent corporation for the benefit of the corporation. Other directors made unsecured loans directly to the corporation in the amount of $75,000. The corporation used $20,409.49 of the loan proceeds to repay an unsecured debt to the defendant, a general partnership composed of five of the corporation's directors, during the preference period before the corporation filed bankruptcy. The issues are: (1) Whether the lenders earmarked the $20,409.49 for repayment to the defendant so that the funds did not become property of the debtor's estate? (2) Whether the earmarking defense is available to insulate such an insider transaction otherwise avoidable as a preference? (3) Whether the repayment of the defendant's debt within 24 days amounted to a contemporaneous exchange thereby excepting the transfer from avoidance as a preference?

### FINDINGS OF FACT.

### PARTIES.

1. THE CORPORATE DEBTOR, ITS DIRECTORS, RELATED ENTITIES AND THEIR BUSINESS

a. Freestate Management Services, Inc., was a Maryland corporation founded in 1984 for the purpose of managing and operating a residential facility for retired persons known as the "Notchcliff Life Care

Community" located in Glen Arm, Maryland. Freestate's sole stockholder was another Maryland corporation known as "Life Care Centers of America, Inc." Disclosure statement, September 7, 1990 [P. 181]. On June 30, 1988, Freestate filed a voluntary Chapter 11 bankruptcy petition in this Court.

b. Notchcliff Associates, also founded in 1984, was a Maryland general partnership and the owner of Life Care Centers of America, Inc. *Id.* In 1984, Notchcliff Associates purchased the land for the purpose of establishing the Notchcliff Life Care Community. The project was financed by various loans from The Commercial Bank aggregating more than $20,000,000, which were guaranteed by Freestate and Life Care Centers. *Id.* On June 30, 1988, Notchcliff Associates filed a voluntary Chapter 11 petition in this Court [Case No. 88–5–1913–JS].

c. The general partners in Notchcliff were:

1. Willard Amoss, M.D.
2. W. Perry Arnold, M.D.
3. Vernon C. Croft, M.D.
4. Jose Gracia, M.D.
5. Jose Martinez, M.D.
6. Ralph J. Mirarchi
7. D.L. Pirovolidis, M.D.
8. Richard D. Poteet
9. Chester L. Price
10. Chawalit Suddhimondala, M.D.
11. Robert H. Wright, M.D.

*Id.*

d. The directors of Freestate Management Services, Inc., were the same eleven partners of Notchcliff Associates. *Id.*

e. The stockholders of Life Care Centers of America, Inc., were the same eleven partners of Notchcliff Associates.

f. Chester L. Price was the president of Freestate Management Services, Inc. *Id.*

2. Richard L. Wasserman is the Chapter 11 bankruptcy trustee in both the Freestate and Notchcliff bankruptcy cases. Mr. Wasserman is the plaintiff in the instant complaint.

3. Village Associates was a Maryland general partnership in the business of owning and managing a medical office building in Harford County, Maryland. The general partners of Village Associates were:

a. Ralph J. Mirarchi
b. Diamidis L. Pirovolidis, M.D.
c. Richard D. Poteet
d. Chester L. Price
e. Chawalit Suddhimondala, M.D.

4. Ralph J. Mirarchi was the managing partner of Village Associates.

## FINANCIAL DIFFICULTIES OF THE NOTCHCLIFF PROJECT.

5. Richard D. Poteet testified at trial that the Notchcliff Life Care Community was in financial trouble from the very beginning and that the directors and partners of Freestate and Notchcliff Associates continuously provided the funds to permit the on-going operation of the project. The first residents moved into the facility in December, 1986. Disclosure statement [P. 181]. During 1987, the eleven directors/partners made equity contributions totalling $700,000. In May, 1987, they made loans to Notchcliff Associates totalling $374,000. In December, 1987, nine directors lent an additional $62,000 to Freestate. Defendant's Exhibit No. 2.

6. On October 20, 1987, Freestate Management Services, Inc., Notchcliff Associates and the eleven general partners of Notchcliff executed an agreement to sell the Notchcliff project to Tatry Housing Organization, Inc. for a purchase price of $24,150,000. Defendant's Exhibit No. 6. A closing date of June 30, 1988 was set forth in the agreement. *Id.* at 8.

7. While the sale agreement was pending, the project continued to experience shortages of cash. It was projected that the sum of $750,000 would be required to fund the Notchcliff facility until consummation of the sale.

## DIRECTORS AGREE TO MAKE LOANS FOR THE BENEFIT OF FREESTATE.

8. In January, 1988, Price and Poteet approached Signet Bank ["Signet"] for a loan of $750,000 to enable Freestate to continue its operations through July, 1988.

Signet declined to make such a loan to the debtor, regardless of the personal guaranties offered by Freestate's directors. After negotiations, Signet agreed instead to make individual, secured loans totalling some $675,000 to nine of the directors and their wives for the benefit of Freestate, in the following amounts:

| | |
|---|---:|
| Mr. and Mrs. Richard D. Poteet | $ 247,500 |
| Mr. and Mrs. Chester Price | 165,000 |
| Dr. and Mrs. W. Perry Arnold | 37,500 |
| Dr. and Mrs. Vernon C. Croft | 37,500 |
| Dr. and Mrs. Jose R. Gracia | 37,500 |
| Mr. and Mrs. Ralph J. Mirarchi | 37,500 |
| Mr. and Mrs. D.L. Pirovolidis | 37,500 |
| Dr. and Mrs. Chawalit Suddhimondala | 37,500 |
| Dr. and Mrs. Robert H. Wright | 37,500 |
| Total | $675,000 |

Dr. Martinez and Dr. Amoss each agreed to lend $20,000 of their own funds. This $40,000, added to the $15,000 they both lent to Notchcliff Associates in February, 1988 and the $20,000 they lent to Freestate in March, 1988, brought the total loans up to the required amount of $750,000. Testimony of Richard D. Poteet; Defendant's Exhibit No. 2.

**PURPOSE AND TERMS OF THE SIGNET LOANS.**

9. Because the parties intended that a portion of the $24 million sale proceeds would be used to repay the Signet loans, Signet required the proceeds of the loans from Signet to the directors to be turned over to Freestate to insure that it continued as a going concern pending the sale. This is confirmed by the testimony of Mr. Poteet and by certain internal memoranda of Signet Bank which indicated the purpose of the loans and the means of their repayment:

Purpose: Working capital financing for company owned by borrower

Payment: Sale of real estate described as Notchcliff retirement community scheduled for 6/30/88.

Commercial Credit loan submission sheet for Poteet and Price loans [Defendant's Exhibit No. 7 and Plaintiff's Exhibit No. 8].

10. A so-called "credit memo" prepared by the Bank regarding its prospective loan to Mr. and Mrs. Price contained the following statements:

Mr. and Mrs. Chester L. Price have requested a $165M 61–day time note accommodation for the purpose of lending the proceeds to a closely-held corporation, Freestate Management Services, Inc., owned by Mr. Price and ten other individuals. This loan request is accompanied by loan requests in varying amounts totalling $750M (includes the $165M for Mr. and Mrs. Price) from the other ten Freestate owners. The funds will be used by Freestate to finance working capital needs from May 1, 1988 to June 30, 1988 at which time Mr. Price will receive his share of the proceeds from the sale of the Notchcliff retirement community in Glen Arm, MD which is owned by Mr. Price et al.

Freestate Management Services, Inc., which is responsible for the day-to-day operation of the Notchcliff facility, will use the funds contributed by Mr. Price primarily for payroll. The loan will not be made directly to Freestate due to the company's poor financial condition and lack of adequate collateral ...

Cash flow shortages and difficulties that arose regarding compliance with the Maryland State Department on Aging regulations caused Notchcliff Associates to enter into an agreement to sell the Notchcliff facility in November, 1987. The buyer is the Tatry Organization, a Slavic church group.

The selling price for the facility is $24 Million. With existing mortgages of roughly $21 Million, Notchcliff Associates is expected to net $3 Million. In addition, Freestate Management Services, Inc. will receive reimbursement of all expenses incurred during the period of time between the date of the sales agreement (November, 1987) and the settlement of the sale (projected for June 30, 1988). Since Mr. Price is both a partner in Notchcliff Associates and an owner of Freestate Management Services, Inc., he will receive a portion of the proceeds from the sale and expense reimbursement ...

Plaintiff's Exhibit No. 10 [Excerpts of Paragraphs IV and V].

11. Signet Bank established the following general terms and conditions for all the loans it made to the directors:

—Borrower agrees to lend the proceeds from this loan to Freestate Management Services, Inc. on the day the loan accommodation is closed and to assign the promissory note to Signet.

—The loan agreement between the borrower and Freestate Management Services, Inc. expires commensurate with the expiration of the note between Signet and the borrower.

—Freestate Management Services, Inc. agrees to open an account at Signet for the deposit of the proceeds from the loan accommodation between the borrower and Freestate.

—Borrower agrees to pay closing costs and legal fees required to close the loan transaction.

Discussion memorandum [Plaintiff's Exhibit No. 9].

## VILLAGE ASSOCIATES ENTERS THE PICTURE.

12. Unfortunately, the closings on the Signet loans were delayed until late April, 1988, by which time Freestate's cash flow situation had worsened. At that time, Chester L. Price, as president of Freestate, approached Ralph J. Mirarchi, as managing partner of Village Associates, for the purpose of obtaining a short-term loan to Freestate from Village Associates in the amount of $20,409.49 until the Signet loans closed. Both Messrs. Mirarchi and Price testified that they agreed that the Village Associates loan would be repaid timely from proceeds of the Signet loans.

13. The purpose of the Village Associates loan was to cover cash shortages in the operations of the debtor. Mr. Mirarchi testified to his recollection that the sum was intended to pay certain taxes that were due.

14. A deposit slip from the general operating account of Freestate at The Commercial Bank [Plaintiff's Exhibit No. 3] indicated that $20,409.49 was deposited in the debtor's account on April 22, 1988, as substantiated by the account ledger [Plaintiff's Exhibit No. 4].

15. On April 25, 1988, an unsecured loan of $20,409.49 from Village Associates to Freestate was documented by the following promissory note:

### PROMISSORY NOTE

$20,409.09

Bel Air, Maryland
April 25, 1988

FOR VALUE RECEIVED, Freestate Management Services, Inc., on demand, promises to pay to the order of Village Associates the sum of Twenty Thousand Four Hundred and Nine Dollars and Forty Nine Cents ($20,409.49) at an annual interest rate of ten percent (10%) per annum, payable at the holder's office at 112 South Main Street, Bel Air, Maryland 21014 or at such other place or to such other party or parties as the holder of this Promissory Note may from time to time designate. The maker, endorsers, and all parties to this note hereby waive presentment and notice of demand, protest and notice of protest and non-payment of this Note.

FREESTATE MANAGEMENT SERVICES, INC.

BY: /s
Chester L. Price

Promissory note [Plaintiff's Exhibit No. 5].

**CLOSINGS ON SIGNET BANK LOANS.**

16. Between April 29, 1988 and May 3, 1988, Signet closed on loans to eight of the nine directors and their wives. Summary of promissory notes [Defendant's Exhibit No. 3]. By agreement between the Bank and the borrowers, the loan proceeds were deposited in account no. 24226870 at Signet Bank in the name of Freestate Management Services, Inc. Testimony of Chester L. Price; check stubs from Signet Account No. 24226870 [Plaintiff's Exhibit No. 15].

17. The loan transactions between Signet, the directors and Freestate involved the following procedure. First, Freestate executed promissory notes for loans from the individual lenders in the following form:

PROMISSORY NOTE

$250,000.00

Bel Air, Maryland
April 29, 1988

FOR VALUE RECEIVED, Freestate Management Services, Inc., on July 2, 1988 or sooner if demanded, promises to pay to the order of Richard D. Poteet the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) at an annual interest rate of ten percent (10% per annum, payable at the holder's office at 112 South Main Street, Bel Air, Maryland 21014 or at such other place or to such other party or parties as the holder of this Promissory Note may from time to time designate. The maker, endorsers, and all parties to this note hereby waive protest and non-payment of this Note.

FREESTATE MANAGEMENT SERVICES, INC.

BY: /s _____
Chester L. Price

Defendant's Exhibit No. 8. Second, the directors and their wives executed assignments to Signet of the notes from Freestate in the identical amounts Signet lent to the directors for the benefit of Freestate.[1] *Id.* Third, Signet deposited the loan proceeds directly into the Freestate account which was opened at Signet Bank for that purpose and then the directors and their wives executed "acknowledgment of receipt of loan proceeds and authority to pay loan proceeds." In essence, the funds lent to the directors and their wives went directly from Signet to the debtor's account.

18. Check stubs reflecting account balances indicate that proceeds from the loans to Price and Poteet totalling $415,000 ($165,000 from Price and $250,000 to Poteet) were deposited into the Freestate account at Signet Bank on April 29, 1988.[2] Plaintiff's Exhibit No. 15.

1. There was some confusion regarding the correct amount of the Signet loan to Mr. Poteet. It was supposed to have been in the amount of $247,500, but the actual amount of the loan was $250,000. This is reflected in Finding of Fact No. 19 *infra,* where a check paid to Mr. Poteet from Freestate includes $2,500 reflecting "Signet overfunding."

2. The source of an additional $100.00 deposited into the account at the same time as the deposit of the loans to Price and Poteet is unknown.

19. Immediately thereafter, the following four checks dated April 29, 1988 were written on the Signet account:

| AMOUNT | PAYEE | PURPOSE |
|---|---|---|
| $ 77,000.00 | Chester L. Price | "To pay off notes on 2/18/88 and 3/29/88" |
| $118,000.00 | Richard D. Poteet | "To pay off notes of 2/17, 2/23, 3/16 and $2,500 overfunded by Signet" |
| $ 64,441.72 | Freestate | "Operating account" [3] |
| $ 18,813.05 | Notchcliff Associates | "Transfer funds to pay off notes dated . . ." |

*Id.*

## FREESTATE DISBURSES PAYMENTS.

20. On April 29, 1988, four checks in various amounts ($11,169.50, $10,000.00, $5,985.33 and $37,286.89) totalling $64,-441.72 were written on the Freestate operating account at The Commercial Bank. Plaintiff's Exhibit No. 4. None of these checks was used to repay the loan to Village Associates.

21. Thereafter, between April 29, 1988 and May 6, 1988, additional sums totalling $265,000 (representing loans from Mirarchi, Pirovolidis, Arnold, Suddhimondala, Martinez, Amoss, Wright and Gracia) were deposited into the Freestate account at Signet Bank. Plaintiff's Exhibit No. 15.

22. The following checks, all dated May 9, 1988, were written on the debtor's account at Signet Bank:

| AMOUNT | PAYEE | PURPOSE |
|---|---|---|
| $17,500.00 | Jose Gracia | "Pay off notes dated 2/18 + 4/1/88" |
| $17,500.00 | Vernon Croft | "Pay off notes dated 2/23 + 4/1/88" |
| $17,500.00 | Ralph Mirarchi | "Pay off notes dated 2/16 + 3/19/88" |
| $17,500.00 | Perry Arnold | "Pay off notes dated 3/23 + 2/18/88" |
| $ 7,500.00 | Robert Wright —VOID— | "Pay off note dated 3/26/88" |
| $ 7,500.00 | D.L. Pirovolidis | "Pay off notes dated 2/18/88" |
| $50,000.00 | Freestate | "Transfer funds" |
| $88,500.00 | Notchcliff Associates | "Payment on notes" |

Check stubs from Signet Account No. 24226870 [Plaintiff's Exhibit No. 15; Defendant's Exhibit No. 5].

**3.** This notation referred to the Freestate operating account at The Commercial Bank. *See* Finding of Fact No. 20 *infra.*

## THE ALLEGED PREFERENCE.

23. It was not until May 11, 1988 that Freestate issued a check to Village Associates in the amount of $20,409.49 drawn on the Freestate operating account at The Commercial Bank. Plaintiff's Exhibit No. 1. The check was paid on May 16, 1988 and the promissory note to Village Associates was marked "paid" on the same date. The Court concludes that the payment to Village Associates was funded from the $50,000 transferred to the Freestate operating account at The Commercial Bank by check dated May 9, 1988 from the Signet account.

24. There was never an agreement in writing between the debtor and its directors requiring the debtor to use the directors' loans to repay Village Associates. Messrs. Price and Poteet testified that the repayment of the loan to Village Associates was orally agreed upon by all of the debtor's directors as a condition of the directors' loans to the debtor. They asserted that the Village Associates loan was not to be repaid from the proceeds of any one specific loan but from the collective proceeds of all of the loans. Testimony of Price and Poteet. This assertion was contradicted by the deposition testimony of Dr. W. Perry Arnold who testified that he was not aware of any agreement among the directors to repay Village Associates with the proceeds of the directors' loans. Dr. Arnold was not a partner in Village Associates. Deposition of Dr. Arnold dated March 10, 1992 [Plaintiff's Exhibit No. 17]. The Court finds that there was an oral agreement between some of the directors that proceeds of their loans to the debtor should be used to repay the debt to Village Associates, but that no further action was ever taken to formally document such agreement among the records of the corporation.

25. The proposed sale of the retirement facility was not consummated. On June 30, 1988, Freestate and Notchcliff Associates filed voluntary Chapter 11 bankruptcy petitions in this Court.

26. On November 29, 1988, Richard L. Wasserman was appointed Chapter 11 trustee in both cases by the office of the United States Trustee.

27. On November 20, 1990, the trustee filed the instant complaint to avoid and recover preferential transfer against the defendant, Village Associates.

28. Village Associates contended that the transfer it received from the debtor was not preferential because it was made with funds that were earmarked by third party lenders for the specific purpose of repaying the loan and that, therefore, the transfer was not made from property of the estate. A second contention was that the transfer was a contemporaneous exchange. These contentions are found to be without merit.

## CONCLUSIONS OF LAW.

### PREFERENCE—ELEMENTS AND PROOF.

1. The trustee's power to recover preferences is derived from Section 547(b) of the Bankruptcy Code.[4]

■ 2. The plaintiff in a preference action bears the burden of proving all of the elements of a preference set forth in Sec-

4. Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
  (1) to or for the benefit of a creditor;
  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
  (3) made while the debtor was insolvent;
  (4) made—
  (A) on or within 90 days before the date of the filing of the petition; or
    (B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
  (5) that enables such creditor to receive more than such creditor would receive if—
  (A) the case were a case under Chapter 7 of this title;
  (B) the transfer had not been made; and
  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b) (1993).

tion 547(b). 11 U.S.C. § 547(g) [5]; *In re Grabill Corp.*, 135 B.R. 101, 107 (Bankr. N.D.Ill.1991); *In re Allegheny Label, Inc.*, 128 B.R. 947, 951 (Bankr.W.D.Pa.1991); *In re Hood*, 118 B.R. 417, 419 (Bankr.D.S.C. 1990); *In re R & T Roofing Structures & Commercial Framing, Inc.*, 887 F.2d 981, 988 (9th Cir.1989); *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir.1988), *cert. denied* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); 4 *Collier on Bankruptcy* § 547.21[5] (15th ed. 1992).

3. In the instant complaint, the Court finds that all of the required elements of a preference have been satisfactorily proven, as follows:

(a) TRANSFER. The check from the debtor to Village Associates was a "transfer" as defined in Section 101(54) [6] of the Bankruptcy Code. 11 U.S.C. § 547(b).

(b) TO OR FOR THE BENEFIT OF A CREDITOR. The check was paid to Village Associates, a creditor as defined in Bankruptcy Code Section 101(10).[7]

(c) FOR OR ON ACCOUNT OF AN ANTECEDENT DEBT. The transfer was made for or on account of an antecedent debt [8] owed by the debtor before such transfer was made. The antecedent debt was the loan from Village Associates to the debtor which was made on April 22, 1988.

(d) MADE WHEN THE DEBTOR WAS INSOLVENT. The trustee is entitled to a presumption that the debtor was insolvent [9] during the 90 days immediately preceding the date of the filing of the bankruptcy petition. 11 U.S.C. § 547(f). The debtor's summary of assets and liabilities executed on August 1, 1988 indicated the existence of debts aggregating $25,503,908.00 as opposed to assets of only $85,651.00. The directors' loans to the debtor in April and May, 1988 prior to the debtor's payment to Village Associates confirm the debtor's insolvency on the date of the transfer (May 16, 1988).

(e) MADE WITHIN 90 DAYS BEFORE THE DATE OF THE FILING. The date of the transfer from the debtor to Village Associates was May 16, 1988, the day the check was honored, *Barnhill v. Johnson*, 503 U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d

---

5. Section 547(g) of the Bankruptcy Code provides:

(g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

11 U.S.C. § 547(g) (1993).

6. Section 101(54) defines "transfer" as follows:

(54) "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption[.]

11 U.S.C. § 101(54) (1993).

7. Section 101(10) defines "creditor" as follows:

(10) "creditor" means—

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

(B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or

(C) entity that has a community claim[.]

11 U.S.C. § 101(10) (1993).

8. Section 101(12) defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). "Claim" is defined in Section 101(5) as follows:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured[.]

11 U.S.C. § 101(5) (1993).

9. Section 101(32) defines "insolvent" as follows:

(32) "insolvent" means—

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32)(A) (1993).

39 (1992), which was within 90 days before the filing of the debtor's bankruptcy petition on June 30, 1988. 11 U.S.C. § 547(b)(4)(A).

(f) THE TRANSFER ENABLED VILLAGE ASSOCIATES TO RECEIVE A GREATER SHARE THAN IT WOULD HAVE RECEIVED IN A CHAPTER 7 LIQUIDATION. The hypothetical Chapter 7 liquidation balance sheet prepared by the trustee [Plaintiff's Exhibit No. 7] revealed total assets of $175,357.07 and total liabilities of $509,733.50. The evidence introduced at trial indicated that after payment of administrative and priority expenses, under the most optimistic circumstances, general unsecured creditors could expect to receive only 20% of their claims. *Cf. In re Virginia–Carolina Financial Corp.*, 954 F.2d 193, 199 (4th Cir.1992) ("The evidence introduced at trial indicates that general unsecured creditors would 'optimistically' receive five to ten percent of the money that the Debtors owed, and we fail to see how Creative can claim to take from the estate any more than this share.") Village Associates did not claim that it was a secured creditor. Therefore, the Court concludes that the transfer to Village Associates enabled it to receive more than its share under a Chapter 7 distribution. 11 U.S.C. § 547(b)(5).

(g) THE TRANSFER INVOLVED AN INTEREST OF THE DEBTOR IN PROPERTY. The concept of "property of the estate" under Bankruptcy Code Section 541(a),[10] which is applicable to the instant complaint for recovery of a preference, is all-inclusive and has been given an expansive interpretation by the courts. *Begier v. I.R.S.*, 496 U.S. 53, 58–59, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46, 56–57 (1990); *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n. 9, 103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515 (1983); *In re Bullion Reserve of North America*, 836 F.2d at 1217; and *In re Allegheny Label, Inc.*, 128 B.R. at 952.

(g)(1) Freestate repaid the Village Associates bridge loan from the debtor's general operating account using funds lent to the debtor by its directors, who in turn borrowed the money from Signet Bank. In the absence of some demonstrable act on the part of the directors to indicate otherwise, the funds lent to the debtor became its sole and exclusive property, prior to the May 16, 1988 transfer to Village Associates. *Virginia Nat. Bank v. Woodson*, 329 F.2d 836 (4th Cir.1964), citing *Smyth v. Kaufman*, 114 F.2d 40, 43 (2d Cir.1940) ("If an unconditional loan is made to a bankrupt, the loan proceeds become part of the bankrupt's free assets").

(g)(2) While it is true that the trustee who prosecutes an action to recover

---

**10.** Section 541(a) provides:
§ 541. Property of the estate.
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
(1) Except as provided in subsection (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—
(A) under the sole, equal, or joint management and control of the debtor; or
(B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.
(3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553 or 723 of this title.
(4) Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.
(5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date—
(A) by bequest, device, or inheritance;
(B) as a result of a property settlement agreement with debtor's spouse, or of an interlocutory or final divorce decree; or
(C) as beneficiary of a life insurance policy or of a death benefit plan.
(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.
(7) Any interest in property that the estate acquires after the commencement of the case.
11 U.S.C. § 541(a) (1993).

a preferential transfer bears the burden of proving all of the elements of a preference set forth in 11 U.S.C. § 547(b), the assertion of the defense of "earmarking" requires the defendant to produce evidence indicating that the transfer did not involve property of the debtor's estate. "When a third person loans money to the debtor specifically to enable the debtor to satisfy the claim of a designated creditor, the loan is not property of the debtor. There is no diminution to the estate, and transfer of those funds to a creditor is not preferential." *In re Hood,* 118 B.R. 417, 419–20 (Bankr.D.S.C.1990), citing *In re Hartley,* 825 F.2d 1067 (6th Cir.1987).

**THE EARMARKING DEFENSE.**

4. The decision of the U.S. Court of Appeals for the Eighth Circuit in the case of *In re Bohlen Enterprises, Ltd.,* 859 F.2d 561 (8th Cir.1988) contains a clear exposition of earmarking:

> The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a "transfer of an interest of the debtor in property". Equivalent language has existed in the Bankruptcy Act for many decades. However, neither the Act, nor the present Code, have apparently ever defined when a transfer involves "property of the debtor", leaving definition of the term entirely to the courts.
>
> In every earmarking situation there are three necessary dramatis personae. They are the "old creditor", (the pre-existing creditor who is paid off within the 90–day period prior to bankruptcy), the "new creditor" or "new lender" who supplies the funds to pay off the old creditor, and the debtor.
>
> When new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to the old creditor, the funds are said to be "earmarked" and the payment is held not to be a voidable preference. [In the beginning the term "earmarking" was not used. That nomenclature was apparently used for the

first time in this context in *Smyth v. Kaufman,* 114 F.2d 40 (2d Cir.1940).] . . .

> In our view, the transaction should meet the following requirements to qualify for the earmarking doctrine:
>
> (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt,
>
> (2) performance of that agreement according to its terms, and
>
> (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.

*Id.* at 565–66. [Some footnotes omitted.] For an excellent and more detailed analysis of earmarking, *see* Epstein, Nickles and White, *Bankruptcy,* 521–27 (1992).

5. In the instant case, the "new lenders" who made loans to or for the benefit of the debtor were Signet Bank and the eleven directors. As the primary lender, Signet Bank exercised exclusive authority over the proceeds of its loans, as evidenced by the fact that it dictated the terms and conditions of the loans to the directors. The only directors who had similar control over the proceeds of their loans to the debtor were Dr. Amoss and Dr. Martinez, who jointly made a loan of $20,-000 directly to the debtor. The other nine directors, whose loans to Freestate were made with funds borrowed from Signet, were mere conduits for the loans to Freestate. They never exercised any individual control over the loan proceeds before the funds were deposited into the debtor's account.

6. This Court finds that the defendant has failed to prove any of the elements of the earmarking defense.

(a) There has been no proof that Signet as "new lender" ever agreed that the Signet loans would be used to repay Village Associates. On the contrary, it has been proven conclusively that Signet conditioned the granting of its loans upon the dedication of loan proceeds to fund on-going expenses of the debtor's operations, including payroll, but not the repayment of outstand-

ing obligations to insiders. The directors were supposed to wait to be repaid until the closing of the Notchcliff sale. *In re Kumar Bavishi & Assoc.*, 906 F.2d 942 (3d Cir.1990); *Port Side Transport, Inc. v. Van Huffel Tube Corp.*, 127 B.R. 165 (N.D.Ohio 1989); *In re Southern Industrial Banking Corp.*, 120 B.R. 921 (E.D.Tenn. 1989), *aff'd* 917 F.2d 24 (6th Cir.1990).

(b) The Signet loan terms were violated when the debtor repaid the notes to the directors and to Village Associates. Therefore, the Court finds that there was a breach of the agreement by the debtor with the new lender (Signet) to fund its on-going operations. *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561 (8th Cir.1988); *In re New York City Shoes, Inc.*, 98 B.R. 725 (Bankr.E.D.Pa.1989), *aff'd* 106 B.R. 58 (E.D.Pa.1989).

■ (c) Viewed as a whole, the transfer to Village Associates resulted in a diminution of the estate. The facts indicate that the money deposited in the debtor's account at Signet Bank was neither held in trust nor earmarked [11] for Village Associates. The defendant is unable to trace the specific loan proceeds from which it was paid. *See* Finding of Fact No. 24, *supra.* Tracing is an essential element of earmarking. *In re Sierra Steel, Inc.*, 96 B.R. 271 (9th Cir. BAP 1989); *In re Int'l Club Enterprises, Inc.*, 109 B.R. 562 (Bankr.D.R.I. 1990); *In re Ludford Fruit Products, Inc.*, 99 B.R. 18 (Bankr.C.D.Cal.1989). The Bankruptcy Code specifically excludes from property of the estate "any property that the debtor may exercise solely for the benefit of an entity other than the debtor," 11 U.S.C. § 541(b)(1) (1993), for example, property that a debtor holds in trust for another. *In re Bullion Reserve of North America*, 836 F.2d 1214; *Begier v. I.R.S.*, 496 U.S. 53, 110 S.Ct. 2258. There is no evidence that such a trust relationship, valid under state law, was created on behalf of Village Associates when proceeds of the loans were deposited into the debtor's account. *Cf. In re L.B. Smith, Inc.*, 37 B.R. 460 (Bankr.D.Md.1984).

■ 7. It defies logic to permit the earmarking defense to insulate the sort of insider [12] transfer made in the instant case. Here, some of the debtor's corporate directors claim to have earmarked loans to the debtor to repay a partnership composed

---

**11.** The following general definitions of what the term "earmarking" contemplates are herewith submitted for the purpose of indicating the lack of earmarking in the instant case:

*Ear-mark.* A mark put upon a thing to distinguish it from another. Originally and literally, a mark upon the ear; a mode of marking sheep and other animals.

Property is said to be *ear-marked* when it can be identified or distinguished from other property of the same nature.

To set apart from others.

Money has no ear-mark, but it is an ordinary term for a privy mark made by any one on a coin.

*Ear-mark rule.* Rule that through the process of commingling money or deposit with the funds of a bank it loses its identity, with the resultant effect of defeating the right of preference over general creditors.

*Black's Law Dictionary*, 56 (5th ed. 1979).

**12.** Section 101(31) of the Bankruptcy Code defines an "insider" as:

(31) "insider" includes—

(A) if the debtor is an individual—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control;

(B) if the debtor is a corporation—

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor;

(C) if the debtor is a partnership—

(i) general partner in the debtor;

(ii) relative of a general partner in, general partner of, or person in control of the debtor;

(iii) partnership in which the debtor is a general partner;

(iv) general partner of the debtor; or

(v) person in control of the debtor;

(D) if the debtor is a municipality, elected official of the debtor or relative of an elected official of the debtor;

(E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and

(F) managing agent of the debtor[.]

11 U.S.C. § 101(31) (1993).

of the same individuals. It is obvious that these insiders intended to prefer themselves and Village Associates, their wholly-owned entity, over the claims of other unsecured creditors. Because Village Associates was made up of some insiders of the debtor, its own status in the bankruptcy case is tantamount to that of an insider. If earmarking is ever available to protect such an insider, courts must require more stringent proof of objective good faith and arm's length conduct than was evidenced in this case.

8. Whether or not earmarking is a valid defense in such circumstances as these, the directors in this case failed to properly segregate funds allegedly designated by them to be paid to Village Associates, and instead commingled the proceeds of their loans with other funds in the debtor's accounts. They failed to formally restrict the purposes for which their loans could be employed with the result that the debtor was free to exercise complete control over them. They failed to memorialize in writing among the debtor's corporate records the terms of any agreements between themselves and the debtor which bound the debtor to use specific funds earmarked for the purpose of repaying Village Associates. Only a portion of the loans issued by Signet Bank to the individual directors for the benefit of Freestate was actually used to fund the on-going operations of Notchcliff pending the sale, as Signet had required. Indeed, the record reflects that the notes of individual directors were paid even before the payment was made to Village Associates. Under all the circumstances, it is clear that the earmarking defense to the trustee's complaint has not been made out.

## NO PROOF OF CONTEMPORANEOUS EXCHANGE.

9. The defense of "contemporaneous exchange" is not available to the defen-

dant upon the facts of the instant case. 11 U.S.C. § 547(c)(1) (1992).[13] To successfully make out a contemporaneous exchange defense, the defendant must prove that the transfer was intended by the debtor and the creditor to be a contemporaneous exchange for new value and that the transfer was substantially contemporaneous.

10. The record reveals that the intent and expectation of the parties was that there would be a short-term loan, not a contemporaneous exchange. They employed a promissory note to document the loan. A note is evidence of a credit transaction. *In re Candor Diamond Corp.*, 44 B.R. 195, 197 (Bankr.S.D.N.Y.1984). "The exception for a contemporaneous exchange does not ordinarily apply to credit transactions[.]" *In re Barefoot*, 952 F.2d 795, 800 (4th Cir.1991).

11. The second inquiry under Section 547(c)(1)(B) is whether the exchange was in fact substantially contemporaneous. This court holds that the passage of 24 days from the making of the loan until its repayment (April 22—May 16) prevents the exchange from being substantially contemporaneous in fact.

## CONCLUSION.

12. The Court finds that the avoidance of the preferential transfer to Village Associates comports with the Congressional intent in enacting Section 547(b) as set forth in the legislative history:

The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation

---

**13.** Section 547(c)(1) sets forth the "contemporaneous exchange" exception to the trustee's power to avoid a preferential transfer:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was

made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1) (1993).

through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution.

H.R.Rep. No. 595, 95th Cong. 1st sess. 177–78 (1977), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 6138, quoted in *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355 (5th Cir.1986), *reh'g denied,* 801 F.2d 398 (5th Cir.1986).

13. The Fourth Circuit Court of Appeals has held that where the statutory elements of a voidable preference have been proven, it is improper to deny a complaint for recovery of a preference on equitable grounds. Where "[a]ll of the objective criteria of § 547(b) have been satisfied ... we simply have no authority to limit or expand the plain language of the statute." *In re Barefoot,* 952 F.2d 795, 801 (4th Cir.1991).

For these reasons, the transfer will be avoided pursuant to 11 U.S.C. §§ 547(b) and 550(a).[14]

ORDER ACCORDINGLY.

---

14. Section 550(a) provides:
§ 550. Liability of transferee of avoided transfer.
   (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
   (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
   (2) any immediate or mediate transferee of such initial transferee.
11 U.S.C. § 550(a) (1993).